Elizabeth LANGLAND

v.

VANDERBILT UNIVERSITY, The Board of Trust of Vanderbilt University, and the College of Arts and Science of Vanderbilt University.

No. 3–83–0115.

United States District Court,
M.D. Tennessee.
Nashville Division.

April 27, 1984.

George E. Barrett, Linda Ross Butts, Nashville, Tenn., for plaintiff.

Wm. N. Ozier, John C. Callison, Associate Gen. Counsel, Nashville, Tenn., for defendants.

## MEMORANDUM

MORTON, Chief Judge.

Elizabeth Langland brought this action against Vanderbilt University and its

agents alleging that the latter had denied her tenure because of her gender. She based her claims on Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.* She also asserted a pendent state law claim for breach of contract. Aside from urging the court to exercise its discretion not to hear the pendent state law claim, the defendants did not challenge this court's jurisdiction over the case at bar.

The action was tried to the court without a jury. After carefully reviewing all the admissible evidence, the court has determined that judgment must be entered for the defendants.

The plaintiff is a white female who received her Ph.D. in English literature from the University of Chicago in 1975. She began teaching at Vanderbilt in the fall of 1975 as a full-time assistant professor[1] of English on the tenure track.[2]

Vanderbilt University is a nonprofit educational institution located in Nashville, Tennessee. It consists of nine divisions of which the College of Arts and Science (hereinafter the College) is the largest. Jacque Voegeli became dean of the College on January 1, 1976. Prior to becoming dean, he had served as chairman of Vanderbilt's history department.

Professor Langland proceeded up the tenure ladder at a normal pace.[3] Her first contract was for a term of three years at the rank of assistant professor. In her third year of employment her mandatory renewal review was conducted. At that time, her contract was renewed for another three-year term at the rank of assistant professor.[4] Professor Langland's mandatory tenure review was conducted in her sixth year of employment with Vanderbilt. She was denied tenure and given a one-year terminal contract for the ensuing year.[5]

When Professor Langland's contract was up for renewal, Professor Rupert Palmer, who was then chairman of the English department, informed her by letter of the evaluation procedures and standards that were followed in such cases.[6] Professor Palmer assured her that while the criteria for tenure would be utilized in evaluating her work, the department "rather looks for activity and promise than any considerable quantity of publication" in granting or denying renewal.[7] The English department

---

1. Listed in ascending order, the teaching ranks at Vanderbilt in 1981 were: instructor, assistant professor, associate professor, professor, and distinguished professor.

2. A tenure-track position is one which may lead to a tenured position on the faculty. Vanderbilt commits itself to retaining tenure-track positions absent financial exigencies or a negative renewal or tenure vote. *See generally Lieberman v. Gant,* 630 F.2d 60, 63 n. 3 (2d Cir. 1980). Dean Voegeli could not recall a tenure-track position ever being terminated for purely financial reasons.

3. Professor Langland's pace was "normal" insofar as she was reviewed at the mandatory three-year intervals. Exceptional candidates could be recommended for tenure as soon as their department felt they were worthy.

4. Had Professor Langland not been approved for renewal, she would have been offered a one-year terminal contract.

5. At the time of trial, Professor Langland was chairman of the English department at Converse College, Spartanburg, South Carolina.

6. *See* Exh. 5 to Professor Langland's deposition: letter dated October 17, 1977, from Professor Palmer to Professor Hassan (Langland). In that letter, Professor Palmer quoted directly from the section of the *Vanderbilt Faculty Manual* (hereinafter *Faculty Manual*) governing tenure appointments.

7. Professor Palmer's understanding of the appropriate standard of review for renewal was vindicated by the subsequent adoption of the "Rules and Procedure for Appointments, Renewals, Promotions, and Tenure in the College of Arts and Science Vanderbilt University" (hereinafter "Rules and Procedures"). That document provided that

[a] person appointed to the rank of Instructor or Assistant Professor should possess the academic competence called for in the description of the position to be filled. It should be evident to the members of the department that the candidate has the capacity to undertake a program of investigation and constructive scholarship at his or her own initiative, and that the candidate is likely to teach effectively.

"Rules and Procedures," section III, A.

unanimously recommended that Professor Langland's contract be renewed. Dean Voegeli expressed his concern about Professor Langland's scholarship,[8] but ultimately concurred in the department's renewal recommendation.[9]

Beginning in the fall of 1978, Professor Langland served as chairman of the women's studies program at Vanderbilt for three consecutive academic years. Prior to accepting that appointment, she was counseled by Professor Palmer, at Dean Voegeli's request, that chairing the women's studies program would not earn her tenure. Professor Palmer warned her that scholarly productivity, as well as service, was an essential prerequisite for tenure. Professor Langland acknowledged her awareness that scholarly productivity was an essential requirement for tenure. She told Professor Palmer that she felt her research in women's studies would enhance her writing on literary criticism.

Professor Langland accepted the chairmanship of the women's studies program. For every course she taught in women's studies,[10] she was released from one of her mandatory English teaching assignments.[11] As chairman, Professor Langland evolved and crosslisted courses, hired staff, and administered the program's budget. She never complained to her superiors of the responsibilities the job placed upon her, nor did she object to reappointment. Most importantly, she never introduced any proof as to the relative difficulty of her administrative duties compared to those of men whom she claimed were given greater credit for their administrative service. *See Kunda v. Muhlenberg College*, 621 F.2d 532, 538 (3d Cir.1980). Without demeaning her contribution to Vanderbilt's women's

At trial Professor Langland fabricated a somewhat contorted syllogism from Professor Palmer's statement that the same criteria were used to evaluate candidates for renewal and tenure. Her reasoning was as follows:

(1) I was evaluated for renewal against the tenure criteria.

(2) My scholarship must have been deemed competent under those criteria since I was renewed.

(3) If my scholarship was competent at the time I was renewed, it was certainly more so at the time I was considered for tenure, since I had published by that time.

Professor Langland's logic was unconvincing because of a flaw in her major premise. The *Faculty Manual* criteria were mandatory in the case of tenure appointments; they were merely advisory in the matter of nontenured renewals. The areas of teaching, scholarship and service were evaluated during both tenure and renewal reviews, but the candidate was expected to have substantiated her scholarly promise with actual performance before tenure would be awarded. *Compare* "Rules and Procedures," section III., A., *supra, with* "Rules and Procedures," section III., B., note 14, *infra.* Apparently Professor Langland did not take her own argument seriously, since she agreed that a faculty member should have published some work before receiving tenure.

If Professor Langland meant to imply that renewal somehow entitled her to tenure, the court finds such an implication to be without merit, *see generally Orr v. Trinter*, 444 F.2d 128, 134–35 (6th Cir.1971), *cert. denied*, 408 U.S. 943, 92 S.Ct. 2847, 33 L.Ed.2d 767 (1972), especially in light of Dean Voegeli's practice of always concurring in the renewal of females. *See* note 9, *infra.*

**8.** When she was considered for renewal, Professor Langland had three articles "in circulation" —a scholastic euphemism for works submitted for publication but not accepted. She had nothing published or accepted for publication. Her book length manuscript was not even ready for inspection.

**9.** During his deanship, Dean Voegeli has concurred in the renewal of every female recommended to him. He has refused to concur in the renewal of five males. He testified that he sometimes concurred in the renewal of weak female candidates in order to give them every chance to prove themselves. *See generally Lieberman, supra*, at 64; *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1340–41, 1353 (W.D.Pa.1977).

**10.** The proof showed that Professor Langland taught "Images of Women" each fall semester from 1978 to 1981. From 1979 to 1981, Gay Welch assisted her in teaching that course.

**11.** As an English professor, Professor Langland was required to teach three departmental courses a semester. When he counseled her on assuming the chairmanship of women's studies, Professor Palmer warned Professor Langland that he could not afford to lose her services as a teacher for more than one course each year. Professor Palmer's position was based not on a disdain for women's studies, but upon his admiration of and need for Professor Langland's teaching abilities.

studies program in the slightest, the court finds that Professor Langland's attempts to inflate the pressures of her administrative duties as chairman were punctured by the credible proof at trial.[12]

Professor Langland's mandatory tenure review began early in 1981. At that time, Vanderbilt awarded tenure based upon an evaluation of the candidate's achievements in the areas of teaching, scholarship and service.[13] As a tenure candidate in the College, Professor Langland was required to demonstrate her competence in all of these areas, and her distinction in either teaching or scholarship.[14] The parties stipulated that Professor Langland had distinguished herself as a teacher and demonstrated at least competence in the area of service; therefore, the court shall confine its attention to those matters which bear upon Professor Langland's competence as a scholar. It is essential to keep in mind that Vanderbilt made competence in all three areas evaluated an irreducible requirement for tenure. Brilliance in one or even two areas could not make up for a finding of incompetence in another.

The tenured members of the English department met in March of 1981 to vote on Professor Langland's application for tenure.[15] Her scholarship provoked the greatest discussion at that meeting. The qualitative assessments of her scholarship were

---

12. For instance, the first year Professor Langland was appointed as chairman, Dean Voegeli agreed to allow Professors Langland, Wiltshire and Hasenmueller to co-chair the program as a troika. Although Professor Langland was designated as sole chairman officially, Dean Voegeli informed the three that he had no objection to all of them performing the actual duties of the chair. In 1978, Dean Voegeli arranged funding for an administrative assistant who aided Professor Langland in performing administrative duties and teaching women's studies courses. The budget for the program was very small, for most of the teachers were full-time faculty members who were paid by their departments. It should also be noted that Professor Langland received a leave of absence to work on her book in the spring of 1979.

13. Regarding tenure, the *Faculty Manual* for the 1980–81 academic year provided in relevant part as follows:

Tenure appointments to the Vanderbilt faculty are made on the basis of: (a) creativity and productivity in research, quality of scholarship, national stature in one's professional discipline; (b) contribution to intellectual and academic life at Vanderbilt or elsewhere; (c) competence, imaginativeness, and interest in teaching. The priorities and weights given these criteria, in making appointments and promotions, may vary by (i) rank, (ii) College or School. Some schools have published separate statements elaborating on the use of these criteria; others rely on this *Faculty Manual* to indicate the standards for promotion and tenure. Excellence in all respects is not required, but competence in all and distinction or outstanding performance in one is necessary.

Tenure is not acquired automatically upon satisfactory completion of a given number of years of service, but upon a positive recommendation by a majority of a department's members who hold academic tenure, acting through the department head and concurred with by the dean of the College or School. . . . This policy does not imply that the department head or dean may not initiate suggestions as to eligible candidates.

*Faculty Manual,* section E (1980).

14. Effective as of the fall of 1980, the "Rules and Procedures" provided that

[f]or appointment or promotion to the rank of Associate Professor, judgments shall be based on performance in research, teaching, and other kinds of intellectual and academic service. Excellence in all these activities is desired; competence in all is required; distinction in either teaching or research is necessary.

"Rules and Procedures," section III., B. As a perusal of the preceding excerpt indicates, the "Rules and Procedures" modified the *Faculty Manual* so that excellence in service and competence in teaching and scholarship could no longer earn tenure for a candidate. This adjustment was consistent with the *Faculty Manual* in that it indicated the "priority" the College of Arts and Science placed upon teaching and scholarship. *See* note 13, *supra.*

15. Only tenured faculty members were authorized to vote on tenure. *See* note 13, *supra.* Professor Langland testified that subsequent to her unsuccessful tenure bid nontenured faculty were present and voting when Ann Cook was proposed for tenure. No inference of discrimination or cover-up on Dean Voegeli's part can be drawn from this irregularity, however, since he denied he was aware of it, much less that he instigated it. Professor Langland also suggested that Ann Cook's promotion was suspiciously irregular because Dean Voegeli proposed it. On that score, she is patently wrong. *Id.*

mixed.[16] As for the quantity of her publications, there was disagreement whether Professor Langland met the minimum requirements the department had demanded in the past. The faculty minutes reflect that "no resolution" was reached as to whether former candidates had been required to have a book accepted for publication or several articles in print before tenure was granted. It was clear that Professor Langland had neither.

When the English department voted on her application for tenure, the body of Professor Langland's scholarly writing consisted of:

(1) one sole-authored article published in a refereed journal; [17]

(2) one sole-authored article published in a locally produced and distributed pamphlet edited by the Vanderbilt chaplain; [18]

(3) one sole-authored article accepted for publication in a book which itself had yet to find a publisher; [19]

(4) a book-length manuscript which had been rejected by the University of Chicago Press; [20]

(5) three articles "in circulation;" [21] and

(6) several works "in progress." [22]

After some discussion about the matter, the English department reached a "general consensus" that Professor Langland's scholarship was competent. It voted 15–5 to recommend her for tenure.

The department's recommendation was forwarded to Dean Voegeli on March 13, 1981. Two professors wrote stinging dissents to Dean Voegeli attacking their department's conclusion that Professor Langland's scholarship was competent. Dean Campbell examined Professor Langland's file and recommended that she not be awarded tenure.[23] Dean Voegeli carefully

---

**16.** Written intradepartmental reports on Professor Langland's scholarly work were submitted by Professors Bell and Elledge. Both found disturbing deficiencies in the candidate's scholarship, but on the whole they judged it to be competent. Professor Ault submitted a very favorable report on Professor Langland's book-length manuscript, *Society in the Novel.*

Six extramural evaluators examined Professor Langland's work—three were chosen by the department and three by Professor Langland. Based solely on her scholarship, three of the extramural evaluators said they would vote for tenure, two said they would vote against tenure, and one said he would strongly recommend tenure if her book lived up to the promise of her essays. It is fair to say that there were both positive and negative comments in the reports of all of the extramural evaluators except Professor Booth, who was uniformly positive in his assessment of Professor Langland's work. Professor Booth did note that *Society in the Novel* had been rejected for publication by the University of Chicago Press after a reader gave the book a very negative evaluation.

**17.** "A Perspective of One's Own: Thomas Hardy and the Elusive Sue Brideshead," *Studies in the Novel,* vol. 12, no. 1 (Spring 1980).

A "refereed journal" is one that subjects articles submitted for publication to scholarly editorial evaluation of the quality of such work before acceptance for publication. Publication in refereed journals is given greater weight within the academic community as evidence of scholarly achievement than is publication in journals that are not refereed.

**18.** "Marriage and Divorce in Contemporary Literature," in *Marriage—Divorce: A Humanistic Perspective.* 62 (Beverly A. Asbury ed. 1978).

**19.** "Society as Protagonist: The Examples of *Nostromo* and *Barchester Towers,*" in *The Power of Form: Essays in the Rhetoric and Poetics of Fiction.* (David Richter and Walter Anderson eds. unpublished).

**20.** *Society in the Novel* (unpublished).

**21.** "Dorothea, Maggie, and George Eliot's 'Highest Heroism'"; "Passionate Experience in Jane Austin's Most Reasonable Men and Women"; and "George Eliot's Masculine Narrator: the Power in *'Janet's Repentance.'*" *See* note 8, *supra.*

**22.** The various stages of "progress" these works were in is difficult to ascertain. Some appeared to have reached at least rough draft form while others seemed to have been little more than concepts in the author's mind.

**23.** Dean Campbell was serving as dean of the Graduate School at the time Professor Langland was up for tenure. He served in an advisory capacity to Dean Voegeli on tenure decisions affecting departments with graduate programs. He was not in the chain of concurrence. *See* note 26, *infra.* Dean Voegeli viewed Dean Campbell's recommendations as a factor to be considered, just like the recommendations of the department.

reviewed Professor Langland's file. He was dissatisfied with her scholarly record. By letter dated May 19, 1981, Dean Voegeli informed Professor Kilroy that both the quantity and quality of Professor Langland's scholarship concerned him.[24] In a passage that became the fulcrum of the plaintiff's theory of the case, Dean Voegeli elaborated his interpretation of "competence" in scholarship as follows:

> To be given tenure, I would say that a scholar should have gone beyond the stage of mastery of the materials and the methods of his or her field to the written dissemination of new methods or substantive discoveries which are validated and which enlighten scholarly peers by affording them understandings not previously in their possession. In short, a successful candidate for tenure should have made a "contribution" to his or her field, a contribution that can be identified, its importance assessed, and the extent to which it has advanced the field made clear and understandable.

Measured against this standard, Professor Langland's file did not persuade Dean Voegeli that her scholarship was competent. Dean Voegeli invited Professor Kilroy and his fellow faculty members to respond to the concerns detailed in his letter. They did, but did not change Dean Voegeli's opinion.[25] On June 12, 1981, Dean Voegeli formally refused to concur in the English department's recommendation that Professor Langland be granted tenure. Under the chain of concurrence system in effect at Vanderbilt, Dean Voegeli's decision terminated the tenure review process.[26]

Professor Langland was informed of the dean's decision and his reason for refusing to concur in her promotion. She did not take the decision lying down. She retained counsel. Her counsel informed President Fields that their client felt Dean Voegeli's decision was a product of sex-based discrimination. President Fields instructed Provost Wendell Holladay to conduct an examination and determine whether:

> (1) Dean Voegeli, in reaching his decision in regard to Professor Langland, in fact applied the criteria provided in the *Faculty Manual* and the "Rules and Procedures;" and
>
> (2) whether the criteria used in regard to Professor Langland, and the standards in applying those criteria, were consistent with other tenure decisions reached by Dean Voegeli within the last six years.

After reviewing all the tenure decisions Dean Voegeli had made as dean, Provost Holladay concluded that Dean Voegeli had applied Vanderbilt's established tenure criteria to Professor Langland in a nondis-

---

**24.** In the interim between the English department's recommendation for tenure and Dean Voegeli's May 19 letter, *Society in the Novel* was rejected by the University of Georgia Press. That rejection was the second the manuscript had suffered. *See* note 20 and accompanying text, *supra.*

**25.** Professor Langland alleged that Dean Voegeli intentionally timed his May 19 letter so that it was received when many faculty members were off campus. She also alleged that Dean Voegeli insisted that all responses be back in his office within five days.

Addressing the latter point first, both Professor Kilroy and Dean Voegeli denied that Dean Voegeli placed any time limit on responses to his letter. The court finds their testimony credible.

Nor can the timing of Dean Voegeli's letter give rise to an inference of discrimination. Professor Kilroy contacted 16 of the 20 tenured members of the English department and in-

formed them of the substance of the dean's letter. Eight of those 16 responded, some at great length. All who responded were in favor of Professor Langland. Most importantly, the proof showed that Dean Voegeli had delayed his decisions on some male candidates past the spring meeting of the Board of Trustees. Such a delay did not obviate the chances for a timely award of tenure since a positive recommendation could be approved by the executive committee of the Board of Trustees at their summer meeting.

**26.** In 1981, the chain of concurrence at Vanderbilt was department, dean, provost, president, chancellor—Board of Trust. A tenure candidate had to be approved by each link in the chain of concurrence. If at any point a decision was made that tenure was unwarranted, the chain was broken and review ceased. A candidate could appeal an adverse decision by filing a grievance with the Faculty Senate Committee on Professional Ethics and Academic Freedom.

criminatory manner. Dissatisfied with that result, Professor Langland filed a complaint with the EEOC and, finally, this court.[27]

When all the proof is examined, Professor Langland's case consists of three basic theories. First, she alleges that Dean Voegeli evaluated her file against a standard different from that set forth in her contract with Vanderbilt. She also contends that whether the standard articulated by Dean Voegeli was proper or not, he applied it more stringently to her than he did to male tenure candidates. Finally, Professor Langland alleges that, in her case, Dean Voegeli failed to follow certain affirmative action guidelines enunciated in Vanderbilt's Conciliation Agreement with the EEOC. Professor Langland's breach of contract, disparate treatment, and conciliation claims shall be addressed *seriatim.*

The parties agree that this court has federal subject matter jurisdiction and venue over Professor Langland's Title VII claim. There can be no denying that her Title VII and breach of contract claims arise out of "a common nucleus of operative fact." This court possesses and chooses to exercise its pendent jurisdiction over Professor Langland's state law claim for breach of contract. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). As the discussion below reveals, the court finds that the defendants did not breach their contract with the plaintiff.

The parties have stipulated that the tenure guidelines contained in Vanderbilt's *Faculty Manual* [28] and "Rules and Procedures" [29] were part of Professor Langland's contract with Vanderbilt. Professor Langland alleges that Dean Voegeli breached that contract by demanding that her scholarship be more than competent.

Obviously, competence is a relative term. In making his formal decision, Dean Voegeli explained that he had found insufficient evidence of Professor Langland's "national stature in her professional discipline" to justify an award of tenure. Professor Langland argues that one cannot reasonably equate scholarship of national stature with competent scholarship. Yet, the *Faculty Manual* plainly states that tenure is awarded on the basis of "creativity and productivity in research, quality of scholarship, *national stature in one's professional* discipline...." (Emphasis added.) Professor Langland appears to harbor the misconception that the "Rules and Procedures" somehow eliminated "national stature" as one of the scholarly requirements for promotion to the rank of associate professor with tenure. Her interpretation of the *Faculty Manual* and the "Rules and Procedures" is refuted by the express language of those documents and the intention of those who drafted them.

██ The *Faculty Manual* contains the enabling provision that authorized the creation of the "Rules and Procedures." [30] The enabling language allows variations in the "priorities and weights" given the criteria, but it does not provide for their elimination. The history of the "Rules and Procedures" reveals that the *Faculty Manual* was always viewed as the paramount document. All of the Vanderbilt faculty members who were asked about the matter, even those who supported Professor Langland, agreed that Dean Voegeli's letter of May 19 set forth the proper standard for promotion to the rank of associate professor with tenure. Provost Holladay and President Fields so concluded in their investigation of Professor Langland's complaint. Shortly after making his decision on Professor Langland, Dean Voegeli denied Professor Keith Davies, a white male in the

---

**27.** In pursuing the course of action she did, Professor Langland bypassed the internal grievance mechanism available to her. Note 26, *supra.*

**28.** *See* note 13, *supra.*

**29.** *See* note 14, *supra.*

**30.** "The priorities and weights given these criteria, in making appointments and promotions, may vary by (i) rank, (ii) College or School." *Faculty Manual,* section E (1980).

history department, promotion to associate professor with tenure because his scholarship was not of national stature. Professor Davies filed a grievance with the Faculty Senate Committee on Professional Ethics and Academic Freedom that made allegations almost identical to those found in Professor Langland's breach of contract claim. The committee reached the unanimous conclusion that Dean Voegeli applied the appropriate criteria for promotion in Professor Davies' case. The opinions of those who draft criteria and work with them on a daily basis must be given great deference by courts faced with the task of interpreting those criteria. *Lieberman v. Gant*, 474 F.Supp. 848, 862 (D.Conn.1979), *aff'd*, 630 F.2d 60 (2d Cir.1980). Clearly, the "Rules and Procedures" were intended to supplement, not replace, the *Faculty Manual*. The unanimity of faculty opinion coupled with the plain language of the *Faculty Manual* lead inexorably to the conclusion that Dean Voegeli did not evaluate Professor Langland's scholarship against a standard different from that contained in her contract with Vanderbilt.

Professor Langland attempted to substantiate her Title VII claim with statistical and circumstantial evidence. There was no direct evidence of intentional sex discrimination in this case.

The tripartite system of proof that is usually followed in Title VII cases is by now too familiar to need repetition. *See, e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The proof in this case, however, did not fit comfortably into that procedural mold. The defendants did not deny that Professor Langland was a member of a disadvantaged group whose employment with them was terminated. As for the fourth element of the *McDonnell Douglas* test, "that after [her] rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications," *Id.* at 802, 93 S.Ct. at 1824, it was satisfied by proof that Vanderbilt's English department was not "tenured in" at the time Professor Langland was denied tenure.

■ The only real point of contention regarding Professor Langland's prima facie case was whether she could prove she was qualified for tenure. *Id.* In this particular case, the court need not decide whether only objective evidence or both objective and subjective evidence should be considered in determining whether a tenure candidate in a Title VII case has proven that he or she was qualified for the position sought. *Compare Lynn v. Regents of the University of California*, 656 F.2d 1337, 1344 (9th Cir.1981), *cert. denied*, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 59 (1982) *with Lieberman*, 630 F.2d 60 (2d Cir.1980). Here, Professor Langland introduced evidence which raised an inference that Dean Voegeli had applied unofficial quantitative publication standards in a discriminatory manner. *See Lynn, supra*, n. 8 at 1345. Furthermore, there was proof which raised an inference that in the case of one male, Dean Voegeli had considered the extraneous criteria of race in deciding to grant tenure. In short, Professor Langland presented proof sufficient to require rebuttal.

■ The defendants rebutted Professor Langland's prima facie case primarily through the testimony of Dean Voegeli. He clearly explained that in his opinion neither the quantity published nor the quality of Professor Langland's scholarly work justified an award of tenure. *See, e.g., Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981). It is beyond peradventure that deficient scholarship is a legitimate nondiscriminatory reason for denying a faculty member tenure. *Lynn, supra*, at 1344. Having determined that the parties met their respective burdens of establishing a prima facie case and articulating a nondiscriminatory reason for the challenged action, the court now turns to the ultimate issue to be decided in this case: whether the plaintiff proved by a preponderance of the evidence that the defendants intentionally discriminated against her because of her sex. *See Unit-*

*ed States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, 410 (1983) (quoting *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093).

*McDonnell Douglas* held that statistics were admissible in a Title VII disparate treatment case. *McDonnell Douglas, supra*, 411 U.S. at 805, 93 S.Ct. at 1825. The Court reasoned that statistics "may be helpful to a determination of whether (the alleged act of disparate treatment) conformed to a general pattern of discrimination...." *Id.* The statistical proof in this case did not persuade the court that there was a general pattern of sex discrimination at Vanderbilt in 1980–81, much less that Dean Voegeli's decision conformed to it.

During the academic year 1980–81, there were a total of 279 tenure and tenure-track positions in the College. Twenty-two of those positions were held by females. Of those 22, only 7, or 31.8%, had achieved tenure. By contrast, 213 of the 257 males on the tenure track were tenured. Thus, of the 220 tenured members of the faculty, 7, or 3.18%, were females. An even smaller percentage of the full and distinguished [31] professors were females.[32]

National availability data reflect that from 1950–78 the percent of doctoral degrees granted to females was 31.6% in the humanities, 16.6% in the social sciences,

and 9.0% in the natural sciences for an average of 19.1% in those three fields.[33] Absent discrimination, one might assume that the percentage of tenured females would approximate this available labor pool.[34] Applying standard deviation analysis, *see, e.g., Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498, 512 n. 17 (1977), one finds a difference between the expected and observed number of tenured females of approximately 39 standard deviations.[35]

It was undisputed that there had never been a tenured female member of Vanderbilt's English Department. The last full-time female faculty member to be hired by the College and gain tenure was hired in 1971 and tenured in 1975. Another female professor who had been hired prior to 1971 was tenured in 1977. Thus, as of June 12, 1981, no female had been granted tenure in the College since 1977.

By June 1981, Dean Voegeli had made 40 tenure decisions, including Professor Langland's. Of the 37 males recommended to him by their departments, Dean Voegeli concurred in 29 cases. Of the three females recommended, he concurred in one case.[36]

Before turning to the defendants' rebuttal of these statistics, *see Hazelwood School District v. United States*, 433 U.S. 299, 309, 97 S.Ct. 2736, 2742, 53 L.Ed.2d

---

**31.** *See* note 1, *supra*.

**32.** Of the full and distinguished professors, 1.6% were females.

**33.** The court's use of this pool by no means indicates its approval of it. To suggest that everyone who has a doctoral degree is qualified for tenure is ludicrous. *See Powell v. Syracuse University*, 580 F.2d 1150, 1157 (2d Cir.1978) (Moore, concurring), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1980); *Johnson, supra*, at 1361. Although Professor Langland presented evidence on the national availability of women with doctoral degrees between 1950 and 1978, she did not tie that availability to specific years—an especially damaging omission in this case, since Vanderbilt did not become subject to Title VII until 1972. *See Lamphere v. Brown University*, 685 F.2d 743, 747 (1st Cir. 1982); *Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 113 n. 11 (1st Cir.

1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). Nor does the propriety of using a national as opposed to a more restricted labor market appear to be a foregone conclusion. The court uses this pool merely to demonstrate that even the most liberal interpretation of Professor Langland's proof cannot support an inference of discrimination in this case.

**34.** *But see* note 33, *supra*.

**35.**

$$[(220 \times .191) - 7] \div \sqrt{(220 \times .191 \times .809)} = 39$$

**36.** Dean Voegeli had reached a preliminary conclusion not to concur in the tenure recommendation of a fourth female. He withheld his decision in her case upon learning that she had a job offer from another university. She subsequently accepted that offer; therefore, no formal decision was made concerning her:

768, 778 (1977), the court shall discuss two of the evidentiary problems they raise. First, Professor Langland's reference to the male-female ratio of Vanderbilt's student body is found by the court to .be confusing since the Supreme Court has clearly ruled such evidence is irrelevant in a case alleging discriminatory hiring or promotion of faculty.· *Id.* at 308, 97 S.Ct. at 2741. . More importantly, Professor Langland produced no expert testimony that either her statistics or the use to which she put them were competent evidence. This was an especially damnable omission given the fact that reasonable minds differ about the competence of statistical evidence in Title VII tenure review cases. *Compare Lynn, supra,* at 1342–43 *with Johnson, supra,* at 1361 *and* Larson, *Employment Discrimination* § 50.72(b). Absent such testimony, the court is left without a guide to steer it toward the proper comparisons or to inform it of the minimum sample size needed to produce reliable statistical evidence. Professor Langland argues that standard deviation analysis should be conducted on the assumption that women will experience a "success rate" similar to men absent discrimination; that is, if 80% of the men considered for tenure receive it, 80% of the women considered should also. As the court reads *Hazelwood School District, supra,* and *Castaneda, supra,* the more apt assumption is that of the total number of tenured faculty members, the percent that are female should approximate the number of females available in the relevant labor pool.[37] Fortunately for Professor Langland, her raw data revealed a great enough disparity between the number of tenured males and females on the faculty to raise

an inference that there was a general policy of sex discrimination in effect at Vanderbilt in 1980–81.

The defendants, however, persuasively rebutted that presumption. They convinced the court that the imbalance between the number of males and females on Vanderbilt's faculty was largely attributable to pre-Act discrimination.[38] *See Hazelwood, supra,* 433 U.S. at 309, 97 S.Ct. at 2742. During Dean Voegeli's tenure as dean, the number of females appointed to tenure-track positions has approximated their national availability in the various fields.[39] During that same period, the number and percentage of female faculty has steadily increased.[40] True, the rate of change has been painfully slow, but that is attributable to the reluctance of the Board of Trustees to approve new tenure-track positions and the infrequency with which existing positions become vacant rather than any intentional discriminatory design of the administration. As for the statistics regarding Dean Voegeli's individual tenure decisions, the sample from which they were deduced was simply too small to yield reliable results. *See International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 339 n. 20, 97 S.Ct. 1843, 1856 n. 20, 52 L.Ed.2d 396, 418 n. 20 (1977); *Johnson, supra,* at 1361. Even if Dean Voegeli had recommended all four women he considered for tenure, only 12% of his tenure recommendations would have been for females. The court finds that since 1975 at least, the defendants have made an effort to increase the number of females on Vanderbilt's faculty.[41]

The *McDonnell Douglas* Court also noted that evidence of the defendants' attitude

---

**37.** *See* note 34, *supra,* and accompanying text.

**38.** *See* note 33, *supra.*

**39.** Between 1976–77 and 1981–82, tenure-track appointments in the College were made as follows:

| | Male | Females | % Female |
|---|---|---|---|
| Humanities | 13 | 4 | · 23.5% |
| Social Sciences | 31 | 5 | 13.9% |
| Natural Sciences | 23 | 2 | 8.0% |

Dean Voegeli must approve every tenure-track appointment in the College.

**40.**

| | 1978/79 | 1979/80 | 1980/81 |
|---|---|---|---|
| Humanities | 11.4%(12) | 14.4%(15) | 20.0%(21) |
| Social Sciences | 9.7%(10) | 9.6%(11) | 6.0%(7) |
| Natural Sciences | 8.0%(8) | 7.8%(8) | 6.3%(7) |

**41.** *See also* defendants' exhibits 43, 44, 52; note 9, *supra.*

toward the plaintiff's legitimate civil rights activities could be relevant to a finding vel non of discrimination. *McDonnell Douglas, supra*, 411 U.S. at 805, 93 S.Ct. at 1825. The analogous inquiry in this case would appear to be Dean Voegeli's attitude toward Professor Langland's activities in the women's studies program. No one asserted that Dean Voegeli was positively hostile toward the women's studies program. Professors Langland, Wiltshire, and Gove did testify that they considered Dean Voegeli's support of the program very marginal. To substantiate their opinions they cited staffing difficulties in women's studies courses, lack of a tenured position in women's studies, and Dean Voegeli's apparent failure to credit Professor Langland's writing in the area of women's studies as scholarly.

 One begins to address these criticisms by noting that in the academic year 1980–81 the women's studies program at Vanderbilt was an interdisciplinary program, not a department. Students could not major in women's studies. Those charged with administering the program never requested that it be approved as a major. It is true that Dean Voegeli turned down the Women's Studies Committee's request for a tenured position. When that request was made, the College was faced with a $600,000 deficit. Requests for more money were being made by departments that did offer majors. Dean Voegeli testified, and the court finds, that his decision not to recommend a tenured position in women's studies was motivated by financial considerations, not a disdain for women's issues. The court also finds that financial restrictions were to blame for the low salaries that were often offered to outsiders to teach women's studies courses. Given these fiscal constraints, Dean Voegeli can hardly be blamed because existing faculty members were unable or reluctant to teach courses in women's studies. Whatever the opinion of this or any other court may be as to the importance of wom-

en's studies to a college curriculum, it is not the judiciary's function to advise university officials what to teach. *See Lynn, supra* n. 5, at 1343. *See generally Faro v. New York University*, 502 F.2d 1229 (2d Cir.1974). An inference of discrimination may not be drawn solely from a judgment that one department or program is more deserving of funds than another, especially where, as here, there are insufficient resources to meet all the university's needs.

Having addressed the negative charges against Dean Voegeli's management of women's studies, the court would be remiss were it to fail to mention his positive accomplishments in that area. During his deanship, he managed to increase the budget of the women's studies program. In 1978, he approved funding for an administrative asistant who eased the administrative and teaching burdens on the chair (at that time, Professor Langland). He approved Professor Langland's release from an English class each time she taught a women's studies course.[42] Dean Voegeli arranged for the women's studies program to receive a Mellon Fellowship, which was used to fund a nontenured teaching position. He also testified that Vanderbilt looked for and finally found a tenure-track appointee in the "hard sciences" who was interested in women's studies. Dean Voegeli's attitude toward Professor Langland's writings on women's studies will be discussed in detail below. At this point, suffice it to say that we found Dean Voegeli's attitude toward Professor Langland's involvement in the women's studies program to be supportive.[43]

There was no proof that the defendants mistreated Professor Langland. *See McDonnell Douglas, supra*, 411 U.S. at 805, 93 S.Ct. at 1825. In the course of her employment with Vanderbilt, Professor Langland received two research grants and a semester's leave of absence to work on her book. She received a third research grant to study in England during the summer of 1980. Dean Voegeli supported her

---

**42.** *See* note 11, *supra*.

**43.** *See generally* def. exh. 54.

for a Bunting Fellowship at Radcliff. He obviously thought enough of her and her abilities to designate her the official[44] chair of the women's studies program. This is not a case like *Sweeney, supra,* where the person who refused to concur in the recommendation for promotion was found to have a condescending attitude toward women. Even Professor Wiltshire, who seemed to be one of Dean Voegeli's stauncher critics, admitted that her relations with him had been "consistently cordial" and free of sexism. The proof left the overwhelming impression that Professor Langland was well liked and well treated at Vanderbilt.

Before comparing her evaluation to those meted out to men, Professor Langland analyzed a few unique things about Dean Voegeli's assessment of her file that she considered to be evidence of his discriminatory attitude toward females in general. She pointed out that a number of the negative comments in her file were underlined while positive ones were not. Dean Voegeli, however, flatly denied underlining anything in Professor Langland's file and she did not persuade the court that he was lying. She observed that Dean Voegeli, in his letter of May 19 to Professor Kilroy, referred to Professor Heilman's negative comments on her work even though Professor Heilman had not read anything she had written. The remark Dean Voegeli alluded to criticized the amount Professor Langland had published, not the quality of her writing. Dean Voegeli only mentioned Professor Heilman's statement in discussing Professor Langland's limited record of publication. Considered in that light, Dean Voegeli's use of Professor Heilman's opinion was perfectly legitimate.

Professor Langland further alleged that Dean Voegeli's failure to credit her writing on women's studies in rating her scholarship was evidence that he discriminated against her. Three things should be noted regarding this argument. First, Dean Voegeli did consider Professor Langland's

teaching and writing in women's studies as evidence of her service to Vanderbilt. Second, Professor Langland admitted that her writing in the field of women's studies dealt primarily with the administrative aspects of women's studies programs. The nature of Professor Langland's writings on women's studies distinguishes this case from *Lynn* where the court held that "[a] disdain for women's issues, and a diminished opinion of those who concentrate on those issues, is evidence of a discriminatory attitude towards women." *Lynn, supra,* at 1343. In *Lynn,* the plaintiff's writings in her designated field of French and Italian literature were discounted because of their feminist perspective. Professor Langland also produced writings in her designated field of English literature that had a feminist perspective. She described these works as feminist criticism. The proof showed that Dean Voegeli ignored these works of feminist criticism, not because of their feminist bent, but because they had not been published or accepted for publication at the time Professor Langland was up for tenure.

This distinction between writing with an administrative focus and a substantive one leads us to the third and most important point concerning the credit given Professor Langland's writings on women's studies. She was being considered for tenure in the English department, not the women's studies program. It was perfectly legitimate for Dean Voegeli to limit his analysis of Professor Langland's scholarly abilities to her writing on English literature. Indeed, given the fiscal and temporal investments both Vanderbilt and Professor Langland had made in her book, it was quite reasonable for Dean Voegeli to focus his attention on that work. This was not a case where Vanderbilt led a person to believe they would be tenured on the basis of their special talents in an area where it was launching a fledgling program.[45] Profes-

---

44. *See note 12, supra.*

45. It was Dean Voegeli's understanding that such a state of affairs did exist in the case of

Professor Williams. Dean Voegeli thought Professor Williams was hired for his expertise in black philosophy.

sor Langland was hired as a specialist in the 18th and 19th Century novel. She was given three grants and one leave of absence to further her work in that area. Dean Voegeli had a right to expect her to demonstrate scholarly competence in English literature separate and apart from any other writing she might have done. The court finds that Dean Voegeli refused to consider Professor Langland's women's studies writings as evidence of her scholarly achievement for academic, not discriminatory reasons.

We now reach the heart of Professor Langland's case: her attempts to prove her claim of sex discrimination by comparing Dean Voegeli's evaluation of her file with his appraisal of the files of selected male tenure applicants. The court need not decide in this case whether tenure review files are privileged, compare *Lieberman, supra.* at 67, *and Keyes v. Lenoir Rhyne College,* 552 F.2d 579, 581 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977) *with In Re Dinnan,* 661 F.2d 426, 432 (5th Cir.1981) *and Smith v. University of North Carolina,* 632 F.2d 316, 341 (4th Cir.1980), since even those courts which profess to recognize such a privilege require production of the files when the defendants rely upon the evaluations contained within them to justify their actions. *Lynn, supra,* at 1347; *Jepsen v. Florida Board of Regents,* 610 F.2d 1379, 1384 (5th Cir.1980); *Keyes, supra.* Dean Voegeli candidly admitted that he was an expert at reading files, not English literature, economics, or whatever a candidate's field of specialization might be.[46] He asserted that he reached his decision through unbiased readings of the files. Given the subjective nature of the criterion "competent scholarship," there was no way Professor Langland could prove Dean Voegeli's assertion was pretextual if she were prohibited from comparing her file with those of males he recommended for tenure.

After reviewing the 40 files on which Dean Voegeli had acted as dean, Professor Langland chose to use 9 of them at trial. In some instances she tried to show that Dean Voegeli would have found her worthy of tenure had he given her credit for the same things he did men. In others, she tried to convince the court that Dean Voegeli could not honestly have found certain males qualified for tenure had he held them to the same standard he applied in her case. Professor Langland introduced two files of female tenure candidates. She offered those as corroborative evidence to show that Dean Voegeli held women to a higher standard than men.

■ Professor Langland's attempts to prove that other females had been treated disparately by Dean Voegeli were the least convincing part of her case. Professor Langland compared the file of Professor Bean, a female faculty member in the Germanic and Slavic language department, with that of Professor Larsen, a male statistician in the mathematics department. Professor Langland argued that Dean Voegeli disparaged textbooks as scholarly products in Professor Bean's case, yet found Professor Larsen's scholarship competent on the basis of textbook authorship. The court finds that Dean Voegeli did, in fact, treat Professors Bean and Larsen differently, but that he did so for legitimate academic reasons. Professor Bean had been warned that she needed to publish in the area of medieval studies to earn tenure. Both Dean Voegeli and Dean Campbell testified that in a department as small as German [47] it was essential that a faculty member demonstrate scholarly competence in a substantive area such as medieval studies as well as in pedagogy. Their opinion was apparently shared by the administrations of other schools: Professor Bean's external evaluators expressed considerable envy over Vanderbilt's ability to reserve a

---

**46.** For the record, Dean Voegeli received his doctoral degree in history.

**47.** At the time Professor Bean was considered for tenure, Vanderbilt's German department

had 6 members. There were 20 members of the mathematics department when Professor Larsen was considered for tenure.

tenured position exclusively for a specialist in second language acquisition. Professor Larsen, on the other hand, provided Vanderbilt with expertise it sorely lacked in a large department. Had Professor Larsen not published a word, Dean Voegeli could still have retained Professor Larsen, terminated Professor Bean, and not been guilty of sex discrimination. Dean Voegeli made a legitimate [48] academic judgment that Vanderbilt had to have Professor Larsen, even if it meant lowering its scholastic standards to approve him. He decided that the mathematics department was large enough to afford such an exception. The court is persuaded that the different treatment accorded Professors Bean and Larsen was based on legitimate academic judgments, not sex discrimination. *See Banerjee v. Board of Trustees of Smith College*, 495 F.Supp. 1148, 1160–61 (D.Mass.1980), *aff'd* 648 F.2d 61 (1st Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

Professor Langland also compared the file of Professor Blumenthal, a female in the history department, with those of Professor Burkhauser, a male in the economics department, and Professor Williams, a male in the philosophy department. All three had been criticized for poor teaching. Professors Burkhauser and Williams were tenured. Dean Voegeli had made an informal decision not to concur in Professor Blumenthal's recommendation, but she accepted a job with another university before he announced his formal decision.[49] The difference between these three candidates lay largely in the responses their respective departments made when Dean Voegeli first communicated his misgivings about granting them tenure. When Dean Voegeli questioned their teaching abilities, Professor Burkhauser's and Williams' departments presented Dean Voegeli with hard statistical data that convinced him their teaching was competent. When Dean Voegeli expressed his reservations to Pro-

fessor Blumenthal's department, the chairman informed him that it would be useless to continue her review since her initial recommendation had been by such a closely divided vote. As Dean Voegeli noted in his May 19, 1981, letter to Professor Kilroy, he considered it incumbent upon the candidate and the department to make the case for tenure. Neither attempted to assuage his doubts in Professor Blumenthal's case. There was no evidence that those who criticized Professor Blumenthal's teaching did so because she was a female. Even if that were so, there was certainly no proof that Dean Voegeli acted with an awareness of any such prejudice. *See Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 943 (11th Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). Given the evidence that was before him, the court is not persuaded that Dean Voegeli reached a different decision in Professor Blumenthal's case than he did in Professors Burkhauser's and Williams' because of the former's gender.

We shall now examine Professor Langland's claim that Dean Voegeli held her to a higher level of scholarly achievement than certain males whom he recommended for tenure. Dean Voegeli did not contend that the standard of scholarly competence had risen while he was dean. For that reason, the court allowed Professor Langland to compare her scholarly credentials to those of males who had been tenured before her. *See Banerjee, supra*, at 1160–61.

She began by noting that none of the files of males whom Dean Voegeli had approved for tenure contained an articulation of "competence" in scholarship exactly like the one in Dean Voegeli's letter of May 19, 1981, to Professor Kilroy. Dean Voegeli did describe his understanding of competent scholarship with very similar terms in the file of Professor Davies, a male whose scholarship he judged to be incompetent.[50] While it is true that Dean

---

**48.** By "legitimate," the court means, of course, untainted by sex discrimination.

**49.** *See note 36, supra.* The position she accepted was not a tenured one.

**50.** Professor Langland argues that, coming as

Voegeli did not recite his understanding of competent scholarship in exactly the same way in every file, all of the statements he made about the matter were consistent with one another and the criteria of the *Faculty Manual.* Competent scholarship, just like the reasonable man, may be described in a number of different but consistent ways. To demand verbatim consistency in such matters would be unrealistic. The court finds no evidence of sex discrimination in the fact that at different times over a period of 5½ years Dean Voegeli used different terms to explain what competence in scholarship meant to him.

Professor Langland agreed with Dean Voegeli that a scholar should have gone beyond "the stage of mastery of the materials and methods of his or her field" before receiving tenure. She agreed that a candidate should have had some dissemination of new ideas. She did not agree that she should have to demonstrate that she *had made* a contribution to her field.[51] Professor Langland reasoned that logically such a requirement could only be met by a scholarly work that had been published and accessible to one's peers for a period of time. Having made this point, Professor Langland compared her file to those of Professors Sweeney, Larsen, Plummer, and Hinshaw. She concluded that none of those persons had enough works published at the time they were considered for tenure to rate as competent scholars under the standard Dean Voegeli applied to her.

Although superficially sound, Professor Langland's argument was persuasively rebutted by the defendants. Dean Voegeli emphasized that he considered not just published works, but works accepted for publication as well to be concrete proof of scholarly achievement. In Dean Voegeli's

opinion, the act of acceptance for publication was the important judgment for purposes of evaluating scholarly competence. He assumed any delays in printing after acceptance were usually attributable to financial considerations extraneous to the merit of the work. Consistent with his opinions, he distinguished between rejections for financial and qualitative reasons in rating a candidate's scholarly achievement.

■ The court finds that the distinction drawn by Dean Voegeli between works published or accepted for publication and those not yet accepted for publication was a nondiscriminatory academic judgment. Whether it was "rational, wise, or well considered" is not the court's concern. *Powell, supra,* at 1157; *accord, Kunda, supra,* at 538. The court is not persuaded that Dean Voegeli's opinion on the matter of publications was merely a mechanism used to obscure his discriminatory intentions toward Professor Langland and other females. Nor is the court persuaded that his adoption of that opinion was more likely than not motivated by sex discrimination. *See Aikens, supra.*

Dean Voegeli's testimony regarding his attitude toward publication was bolstered by his letter of May 19, 1981. Certainly, there is nothing inconsistent with Dean Voegeli's testimony and his opinion that a candidate's writing should have been "validated." Considering the context in which it appears, the court interprets the term "validate[d]" in the May 19th letter to mean "to corroborate or support on a sound basis or authority." *See Webster's Third New International Dictionary* (1981). The court is further persuaded to adopt this interpretation by Dean Voegeli's testimony that he considered corroboration

close as it did to his decision in her case, Dean Voegeli's action in Professor Davies' case must be construed as an attempt to insulate himself from an imminent sex discrimination charge. The court does not find her argument convincing. Dean Voegeli denied using Professor Davies' file as a cover-up. Moreover, if Dean Voegeli had wanted to guard against a sex discrimination charge, why would he have used different terminology to describe competent scholarship

in the case of Professor Sweeney, a male who was considered for tenure while this lawsuit was pending?

51. Nor did Professor Langland think that she should have to prove the national stature of her scholarship, but the court has already addressed that issue.

through reference to prior authority in the field an essential characteristic of scholarship. In measuring the body of Professor Langland's publications, he noted that one of her articles "had been accepted for inclusion in an edited work that has not yet been *accepted* for publication." (Emphasis added.) He does not criticize the edited work for not being published. His letter expresses concern over the fact that her book has been rejected for qualitative deficiencies, not that it has not been printed. He notes that the issue raised at the faculty meeting was about her lack of a published or *accepted* book and the number of her published articles.

■ The day before he formally refused to concur in Professor Langland's recommendation, Dean Voegeli confirmed with Professor Kilroy that "all of those candidates recommended for promotion by the [English] department in the past several years have had at least several articles in print and in some cases have had an accepted book-length manuscript." Professor Langland herself admitted that it "might be" more important to publish a book in English than in other disciplines. The weight of the evidence convinces the court that one of the primary factors shaping Dean Voegeli's decision in Professor Langland's case was his conclusion that she had failed to meet the quantitative publication standards of her department. It is perfectly legitimate for one department to have different or even higher standards for tenure than another so long as those standards are neither higher than the contractual terms of employment nor discriminatory in origin or application. *See, e.g., Furnco Construction Corporation v.*

*Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978); *Sweeney, supra,* at 112; *Powell, supra,* at 1157. While Dean Voegeli insisted on scholarly competence from all those whom he recommended for tenure, he recognized that in different fields different forms of publication were considered more indicative of a scholar's abilities than others.[52] In English, for instance, the most highly respected form of publication was the sole-authored book. In economics, journal articles, often coauthored, were the typical mode of publication.

There is no question that Professors Gottfried and Plummer, the two English department faculty to receive tenure under Dean Voegeli, were qualified for tenure measured against the standard enunciated in Dean Voegeli's letter of May 19. They had a significantly larger number of works published and accepted for publication at the time of their tenure review than did Professor Langland. Professor Langland made a feeble effort to compare the forward contract on her coedited book *Formation/Deformation/Transformation: The Female Novel of Development* with Professor Plummer's editorially accepted book. Under cross-examination, she admitted that a forward contract was merely an expression of interest, and that *Formation/Deformation/Transformation* had not undergone a qualitative evaluation by readers as had Professor Plummer's book.

Even if the comparisons Professor Langland made between the quantity of her publications and those of males in other departments were found to be relevant, they would not help her case. Taking into consideration all the factors Dean Voegeli

**52.** As a general rule, Dean Voegeli thought sole-authored works were better indicators of a scholar's talents than coauthored ones although that was not true in all disciplines. When he encountered a coauthored work, he would try to determine who the primary author was. Coauthored works, in turn, were considered more significant than coedited ones. Refereed publications, *see* note 17, *supra,* were more impressive than those which were not. Chapters in books were less significant than articles in journals since the former generally did not undergo

as stringent a screening process as the latter. Books were the most impressive publications. Conference papers were considered to be the least significant form of dissemination for two reasons: depending on the discipline they could be very easy to obtain, and if they were noteworthy Dean Voegeli assumed they would be published. The court repeats that these were the general rules Dean Voegeli applied in evaluating a candidate's scholarship. Depending on the circumstances, some of them might be valid, others invalid, and still others irrelevant.

weighed in evaluating a candidate's scholarship,[53] their publication records were all superior to hers—with the possible exception of Professor Larsen, who, as was noted above, was a special case.

The fact that all the males to whom Professor Langland compared herself had a significantly greater number of works published or accepted for publication than did she provides the basis for an alternative holding in this case: Even if Professor Langland had persuaded the court that Dean Voegeli held her to a higher standard than males by demanding that she possess published works, not just works accepted for publication, the court would have found for the defendants. The court would have found for the defendants because they persuaded it that Professor Langland clearly did not meet the nondiscriminatory standards that were, in fact, applied to males. In other words, they proved that it was more likely than not that she would not have been tenured even absent discrimination (had there been any).

Professor Langland argued that Dean Voegeli disparaged extramural appraisals of her work that were not detailed, but that he did not do the same with males. She pointed out that all of Professor Williams' extramural evaluations lacked detail. She also noted that Dean Voegeli made no mention of a very detailed negative critique in Professor Gottfried's file. Dean Voegeli testified that he rarely made detailed comments about candidates he found worthy of tenure. At several points in the trial, Dean Voegeli expressly disclaimed his adoption of certain opinions contained in the files of candidates he had recommended for tenure. The fact Dean Voegeli concurred in a recommendation for tenure meant that he had judged the candidate to be at least competent in teaching, scholarship and service and excellent in either teaching or scholarship. The mere fact that Dean Voegeli failed to comment on a particular aspect of a file indicates nothing unless that aspect was indispensible to a finding of competence or excellence in one of the three criteria.

The recommendations of Professor Williams' extramural evaluators were uniformly positive. There was no need in his case, as there was in Professor Langland's, for Dean Voegeli to distinguish between conflicting opinions and decide to which to give more credence. With regard to the negative evaluation in Professor Gottfried's case, it was the only negative evaluation in his file. The others were very positive. In its forwarding letter, the English department asserted that the criticisms of Professor Gottfried's book were based upon petty points or ones taken out of context. Considering the strong evaluations both Professor Williams and Professor Gottfried received, Dean Voegeli could very well have concluded that there was no problem that needed to be addressed in their cases. Certainly there was no proof to the contrary.

Professor Langland alleged that Dean Voegeli deferred to departmental recommendations in the cases of Professors Gottfried, Burkhauser, Williams, and Sweeney, but not in hers. In Professor Langland's opinion, this alleged difference in treatment afforded herself and these males was further evidence of Dean Voegeli's discriminatory intentions towards her. It is true that Professor Langland was recommended for tenure by her department by a vote of 15 to 5. Dean Voegeli admitted that the English department was a good department that had a history of being careful in its tenure recommendations. In Professor Langland's case, however, Dean Voegeli was persuaded that the English department was straying from its former path. He knew it was abandoning its former practice, if not its policy, of requiring a candidate to have several articles in print and preferably a book accepted for publica-

---

**53.** In addition to the factors enumerated in note 52, *supra*, Dean Voegeli rated the quality of a candidate's work. He based his qualitative evaluation upon the critiques of the intra- and extramural reviewers according to their reputation in their profession, the prestige of the schools at which they taught, and their acquaintance with the candidate.

Finally, Dean Voegeli took into account the need the candidate filled within the College.

tion before recommending tenure. Furthermore, he had reason to doubt the department's ability to dispassionately predict Professor Langland's future publishability. When she was recommended for renewal in 1977, the department predicted that Professor Langland's article "Passionate Experience in Jane Austen's Most Reasonable Men and Women" would be her most important work and the first to find a publisher. By the time of trial, this piece had been repeatedly rejected and was still not published.

Those faculty members who responded to Dean Voegeli's concerns about Professor Langland's scholarship were uniformly positive in their support of her.[54] None of them vanquished his doubts. They (and Professor Langland at trial) accused those who criticized Professor Langland's writing of failing to understand its import. That argument, however, only confirmed Dean Voegeli's impression that Professor Langland had trouble effectively communicating her ideas.[55] They spoke of their belief that Professor Langland would publish in the future, but that assurance only confirmed Dean Voegeli's conviction that she had not yet achieved adequate publishing success. Dean Voegeli found their references to the financial restraints on publishers irrelevant, since Professor Langland's book had been rejected for perceived qualitative deficiencies. Thus, considering her file in isolation, it was perfectly reasonable for Dean Voegeli to refuse to defer to the department's excuses for Professor Langland's scholastic weakness. The test in this Title VII action, however, is whether Dean Voegeli treated males more favorably than Professor Langland because of gender. *See Kunda, supra,* at 538.

There was no evidence that Dean Voegeli "deferred" to the department's recommendation in Professor Gottfried's case. Just because the department addressed Professor Gottfried's sole critical evaluation in its forwarding letter to Dean Voegeli does not mean he would not have concurred in the recommendation without some explanation. Professor Gottfried's evaluations were overwhelmingly positive. He had several articles in print and a book accepted for publication. His departmental recommendation was unanimous.

Dean Voegeli did testify that he was persuaded to concur in the recommendations of Professor Burkhauser and Professor Williams by their respective departments. That persuasion came primarily in the form of hard statistics that gave objective evidence of their competence as teachers. Dean Voegeli was not asked to rely, as he was in Professor Langland's case, on the subjective impressions of individual faculty members.

Professor Sweeney's case is more troubling. In recommending Professor Sweeney for tenure, Dean Voegeli expressly stated that he was deferring to the department although there appeared to be a "fundamental ... difference" between himself and the department regarding the meaning of "competence" in scholarship. Like Professor Langland, Professor Sweeney's qualitative evaluations were mixed. He had the unanimous vote of his department, she a very strong one.[56] The difference between them lay in their scholarly accomplishments. If Dean Voegeli considered Professor Sweeney to be "close to the minimum standard" with three sole-authored articles published or accepted for publication in refereed journals, two coauthored articles accepted for publication in refereed journals, one coauthored article published in a refereed journal though the article

---

**54.** Eight faculty members responded to Dean Voegeli's letter of May 19, 1981. Professor Booth also telephoned Professor Kilroy to reaffirm his endorsement of Professor Langland's work.

**55.** Although he wrote in support of her, Professor Bell admitted that some of the blame for the critics' misapprehensions lay with the difficulty Professor Langland had in expressing her ideas clearly.

**56.** Dean Voegeli did not rubber stamp department recommendations. During his deanship he refused to concur in the recommendations of 3 males and 1 female who had received the unanimous vote of their respective departments.

itself was not referred, and a coauthored chapter in a published book, then one can see just how far from competence Professor Langland was.[57] Dean Voegeli was also persuaded to concur in Professor Sweeney's recommendation by the facts that the referees on the journals that had accepted his work were considered tough and that the journals themselves were some of the best in the nation.

The mere fact that Dean Voegeli decided to defer to the department's recommendation in the cases of certain males but not in Professor Langland's does not give rise to an inference of gender discrimination. Even if it did, Dean Voegeli rebutted that inference by explaining why he acted differently in different cases. His reasons did not include gender discrimination. Professor Langland did not persuade the court that his articulated reasons were pretextual.

Professor Langland's final reason for thinking that Dean Voegeli held her to a higher standard than males was the fact that he allegedly disparaged those extramural evaluators who knew her. She observed that one saw no such disparaging remarks in the file of Professor Williams, all of whose evaluators appeared to have known him, nor in that of Professor Gottfried, many of whose evaluators indicated they knew him. This argument was another example of Professor Langland's repeated attempts to prove her case by negative evidence. Such evidence was singularly unconvincing in light of Dean Voegeli's positive testimony that he sometimes communicated his concerns about a file to the chairman of the department orally, and that he rarely recorded his thoughts in detail on files of which he approved. *See Wallin v. Greyhound Corporation,* 341 F.2d 521, 523 (6th Cir.1965). Even if Dean Voegeli did not discount the evaluations of those extramural evaluators who knew Professors Williams and Gottfried, there were sufficient differences between their cases and Professor Langland's to rebut any inference of discriminatory intent.

Dean Voegeli testified that he was aware that both Professor Booth and Professor Richter were acquainted with Professor Langland. His testimony, however, was that Professor Booth's opinion was the only one he gave less weight to because of that acquaintance, and even then he did not eliminate Professor Booth's evaluation altogether. Indeed, Dean Voegeli's letter of May 19, 1981, indicates that he found Professor Richter's critique helpful. Professor Booth's relationship with Professor Langland was a uniquely close one in academic circles. He had directed her master's thesis. He was the second reader of her doctoral dissertation. He candidly admitted that he could not be objective about Professor Langland's career. As Dean Voegeli indicated, Professor Langland's success was to some extent a reflection of the validity of Professor Booth's ideas and pedagogical aptitude. The letters of Professor Gottfried's and Williams' evaluators, on the other hand, implied that their acquaintances grew out of the candidates' professional activities, as, apparently, did Professor Langland's with Professor Richter. Under these circumstances, the court does not find that Dean Voegeli's discounting of Professor Booth's evaluation was motivated by gender discrimination.

We shall now address the points Professor Langland raised in arguing that Dean Voegeli would have recommended her for tenure had he evaluated her file in the same manner he evaluated those of male candidates. Basically, with this category of evidence, she tried to convince the court that Dean Voegeli gave males credit for things that he ignored in her case.

Professor Langland asserted that Professors Gottfried's and Williams' appearances at national conferences were considered evidence of their "national stature" while hers were not. It is true that the minutes of the faculty meeting on Professor Gottfried's tenure and the forwarding letter from the department in Professor Williams' case cite those candidates' participation in

---

**57.** *See* notes 17–22, *supra,* and accompanying text.

national conferences as evidence of their scholarly stature; but, Dean Voegeli testified that he did not agree with those assumptions. He gave conference papers and appearances very little weight in rating a candidate's scholarship.[58] His judgments about the scholarship of the two males in question were based upon their published works (including in that term works accepted for publication). Dean Voegeli rebutted Professor Langland's arguments regarding conference appearances, and she did not persuade the court that his rebuttal was pretextual.

Professor Langland also complained that only Joyceans were chosen to evaluate Professor Gottfried's writing, but that no similar effort was made to pick "theoretical" critics to rate her work. The extramural evaluators were chosen by the English department and Professor Langland. A candidate could protest if she felt an evaluator could not fairly rate her work. Professor Langland did not; therefore, she was presumed to be satisfied with the choices that were made. Dean Voegeli had nothing to do with the choice of evaluators. There was no proof that he knew anything about their or Professor Langland's critical predilictions; thus, no inference of discrimination can arise from his reliance upon their critiques. *See Lincoln, supra,* at 943.

Professor Langland argued that Professor Hinshaw's scholarship was evaluated in light of his administrative contributions. Professor Langland argued that Dean Voegeli should have taken her administrative responsibilities into account in judging her scholarly productivity. In his letter soliciting extramural evaluators for Professor Hinshaw's tenure review, the chairman of the economics department wrote, "We would like your opinion on whether he (Professor Hinshaw) has demonstrated at least competence in research, taking into consideration that his extensive administrative and committee services have left him relatively little time for research." There was no proof that Dean Voegeli agreed that

administrative responsibilities were a proper factor to consider in rating a candidate's scholarship. *See Wallin, supra.* To the contrary, the court's impression was that Dean Voegeli found Professor Hinshaw's scholarship to be competent using the same standard he measured all the other tenure candidates against. Dean Voegeli did observe that it was misleading to characterize the aggregate of Professor Hinshaw's written work as the product of 11 years' labor, since Professor Hinshaw's administrative assignments prevented him from teaching full time 8 of those 11 years. Professor Langland's administrative duties were never so onerous that she had to assume part-time status.

Professor Langland pointed out that Professor Williams' writings on black philosophy were considered evidence of his scholarly achievement, but that her writings on women's studies were not considered evidence of hers. We have already discussed the reasonableness of Dean Voegeli's decision not to credit Professor Langland's women's studies writing as proof of her scholarship. The points raised in that discussion apply with equal force here. Professor Williams' writings concerned an area of specialization within his recognized discipline. Professor Langland's women's studies writings did not.

Professor Langland asserted that race, not competence in teaching, won Professor Williams tenure. Her theory was that if being black could make up for Professor Williams' deficiencies, being female should have made up for hers. The court must admit that it initially thought Professor Langland would win her action on this argument. Letters contained in Professor Williams' file, especially Dean Campbell's, indicated that blatant tokenism played a central role in Professor Williams' success. Dean Voegeli, however, pointed out that Dean Campbell was not in the chain of concurrence. Dean Campbell's opinions were merely advisory, they were not bind-

---

**58.** *See* note 52, *supra.*

ing.[59] They were a factor Dean Voegeli considered. Dean Campbell's and Professor Post's memoranda concerned Dean Voegeli, but in the end he concluded their assessments were invalid. As previously found, Dean Voegeli decided that Professor Williams was qualified for tenure because the philosophy department convinced him that Professor Williams was a competent teacher.[60] Dean Voegeli also took into account the possibility that motives extraneous to Professor Williams' ability might have entered into Professor Post's letter and the votes of some of the faculty who opposed him. Professor Post had tried unsuccessfully to get the department to offer Professor Williams' position to a black philosopher from Harvard with whom Professor Post was impressed. Dean Voegeli also felt that some of the philosophy faculty might have voted against Professor Williams for fear his tenure would obviate the need for the Mellon Fellowship they had requested. The court finds that Dean Voegeli concurred in Professor Williams' recommendation because he honestly thought Professor Williams had satisfied the established tenure criteria. The court cannot say that belief was so ridden with error it was pretextual. *See Lieberman, supra,* at 65.

Professor Langland also contended that the defendants failed to comply with the terms of a conciliation agreement Vanderbilt entered into with the Department of Labor in August of 1980. That agreement called for "increased counseling by the Deans" with minority and female faculty about "performance expectations through the ranks." That agreement was consummated pursuant to the power vested in the Labor Department by Executive Order 11246 and its progeny of regulations. Although there is no private cause of action under Executive Order 11246 or the regulations adopted thereunder, *e.g., Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 822 n. 4 (7th Cir.1975), *cert. denied,* 425 U.S. 943, 96 S.Ct. 1683, 48 L.Ed.2d 187 (1976); *Weise v. Syracuse University,* 522 F.2d 397, 411 n. 23 (2d Cir.1975); *Manuel v. International Harvester Company,* 502 F.Supp. 45, 47 (N.D.Ill.1980) (and cases cited therein), this court finds that proof of compliance or noncompliance with conciliation agreements may be admitted in Title VII actions as circumstantial evidence of discriminatory intent.[61] *See Cohen, supra; cf. Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1559 (11th Cir.1983) (breach of collective bargaining agreement may reflect on motive in Title VII cases). Dean Voegeli testified that he delegated his counseling duties to the chairmen of the various departments. In Professor Langland's case, Dean Voegeli specifically inquired of Chairman Kilroy whether she should be counseled on tenure. Chairman Kilroy replied that additional counseling would be useless in Professor Langland's case considering her then rapidly approaching tenure review. Under these circumstances, the court does not find any evidence of discriminatory intent. Certainly there was no evidence here, as there was in *Kunda,* that the Dean had counseled males about their progress toward tenure. *See Kunda, supra,* at 541.

---

**59.** Dean Voegeli testified that he acted contrary to Dean Campbell's recommendation on 8 of the 40 files he reviewed.

**60.** Professor Langland did not challenge the judgment that Professor Williams was excellent in service. There was no question that he had demonstrated at least competence in the scholarship of black philosophy which was an area of specialization within the field of philosophy. There were statements by members of the philosophy department that Professor Williams was not competent in the traditional areas of philosophical scholarship. However, both Dean Voegeli and Dean Campbell testified that it was their understanding that Professor Williams had been hired specifically to teach black philosophy. *See* note 45, *supra,* and accompanying text.

**61.** The Seventh Circuit has held that a private party may sue under 42 U.S.C. § 1981 to enforce a 11246 contract on a third party beneficiary theory. *Jones v. Local 520, International Union of Operating Engineers,* 603 F.2d 664, 665 (7th Cir.1979), *cert. denied,* 444 U.S. 1017, 100 S.Ct. 669, 62 L.Ed.2d 647 (1980); *accord, Manuel, supra,* at 48. Since neither party raised this issue, the court declines to address it.

Given the holding that Professor Langland was not the victim of sex discrimination, the court does not reach her Title IX claim.

In conclusion, the court finds that Professor Langland did not carry her burden of persuading it that Dean Voegeli refused to concur in her tenure recommendation because of her sex. This was not a case where the defendants flip-flopped between the justifications for their action. It was not a case where a justification was advanced only after the defendants' motives were challenged. From the very first, Dean Voegeli disputed Professor Langland's scholarly competence. The court has made an exhaustive comparison of her file to those of male professors and has determined that she was held to the same standard they were. Perfect consistency in matters of subjective judgment can neither be expected nor demanded. Our duty was to determine whether Dean Voegeli's action was motivated by discriminatory animus. We were not persuaded that it was.