# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
July 9, 2013 Session

## SARA EIGEN FIGAL v. THE VANDERBILT UNIVERSITY

**Appeal from the Chancery Court for Davidson County**
**No. 10453I        Ellen H. Lyle, Chancellor**

---

**No. M2012-02516-COA-R3-CV - Filed September 27, 2013**

---

A professor denied tenure at Vanderbilt University brought suit against the university asserting causes of action for breach of contract and negligent misrepresentation. We affirm the trial court's grant of summary judgment in favor of the university.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, M.S., P.J., and RICHARD H. DINKINS, J., joined.

Richard J. Braun and Julie Faye Travis, Nashville, Tennessee, for the appellant, Sara Eigen Figal.

John C. Callison and William N. Ozier, Nashville, Tennessee, for the appellee, The Vanderbilt University.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

Sara Eigen Figal, who attended Yale for her undergraduate education and received her Ph.D. from Harvard, was hired by Vanderbilt University in 2001 as an assistant professor in the Department of Germanic and Slavic Languages in the College of Arts and Sciences. Beginning with the 2002-2003 academic year, Dr. Figal was appointed for a three-year term as an assistant professor on the tenure track. The terms of Dr. Figal's contract of employment with Vanderbilt were set forth in the university's faculty manual and in the Rules and Procedures for Faculty Appointments, Renewals, Promotions and Tenure in the College of Arts and Sciences ("the college rules"). In July 2005, she was reappointed to a two-year tenure track term beginning with the 2006-2007 academic year.

In accordance with the faculty manual and college rules, assistant professors on the tenure track are normally reviewed for reappointment near the end of their second year. An affirmative vote for reappointment (by majority vote of the tenured members of the department and the concurrence of the Dean and the Provost) typically results in an extension of the appointment for an additional two years. A second review takes place during the candidate's fourth year of appointment; an affirmative vote at the second review ordinarily leads to a three-year extension of the candidate's appointment. Candidates for tenure are reviewed for the last time during or before the penultimate year on the tenure track, usually the seventh year of the appointment. A negative vote of the department at any of the three reviews will result in the expiration of the contract at the end of its term.

A candidate for tenure at Vanderbilt is evaluated with respect to three criteria: scholarship, teaching, and service. The faculty manual and college rules provide that, for promotion to associate professor with tenure, excellence in all three areas is desired, but a candidate must establish excellence in scholarship, highly effective teaching of undergraduate and graduate students, and satisfactory service to his or her department, the university, and the profession. The candidate has the burden of proving that he or she meets the criteria for tenure. The manual states that Vanderbilt "expects the level and quality of achievement in these three areas to be equivalent to that required for tenure in leading departments or schools of other major research universities."

With respect to scholarship and research, the area at issue in this case, the faculty manual provides that, "By the time of the tenure review, [candidates for tenure] must have completed and made available research, scholarship, criticism, or artistic production of such high quality as to gain favorable recognition within their discipline and at a national level." The manual contemplates that each school shall publish "a statement specifying its standards and procedures for the award of tenure and for promotion within the tenured ranks." As previously stated, the College of Arts and Sciences developed its own rules. The college rules provide that, "[t]o the fullest extent practicable, all understandings with respect to the terms of appointment shall be stated in the letter of appointment." It is undisputed in this case that excellence in scholarship in the humanities at Vanderbilt requires publication of a book with a recognized publisher, publication of scholarly articles in peer-reviewed journals, and progress toward a second book or similar research project. Progress toward a second book may be demonstrated by peer-reviewed articles or peer-reviewed book chapters capturing the first few chapters of the book or by final versions of several chapters sufficient to show the quality of the project.

Dr. Figal's first review occurred around the time of her reappointment in July 2005. At that time, Dr. Figal's first book (based upon her dissertation) was in progress; a volume she edited had been accepted for publication, and she had completed several articles and

book reviews. In a memorandum dated September 22, 2005, Dean Richard McCarty, the Dean of the College of Arts and Sciences, provided Dr. Figal's department with his assessment of her progress toward tenure. Based upon her scholarly work to that point, Dean McCarty concluded that she had made a "solid case for reappointment on the basis of her research." He noted that Dr. Figal intended to finish her book manuscript in the fall of 2005 and then planned to pursue research toward a second book. Dr. McCarty stated that "by far the most important project in Professor [Figal's] effort to build a successful case for tenure" was "to finish her book strongly and place it with the best possible publisher." He advised: "All efforts now should be directed toward the completion and publication of her book, and after that to the development of further areas of research interests." In a memorandum to Dean McCarty in October 2005, Dr. Konstantine Kustanovich, chair of the department, confirmed that he had communicated the contents of the September 2005 memo to Dr. Figal. (Dr. Figal concedes that she received that counseling and a copy of Dr. McCarty's memorandum.)

Dr. Figal's second review occurred in the spring of 2007. As with her first reappointment, the department unanimously recommended that she be reappointed. In June 2007, Dr. Figal was reappointed as an assistant professor on the tenure track for a two-year term beginning in the 2008-2009 academic year. Dr. McCarty advised Dr. Figal that her mandatory tenure review would be conducted during the 2008-2009 academic year.[1] In a memorandum dated June 15, 2007, Dean McCarty provided the current department chair, Dr. Dieter Sevin, with his assessment of Dr. Figal's progress toward tenure. Although he concluded that Dr. Figal's progress warranted reappointment, Dean McCarty emphasized the further progress that Dr. Figal needed to make in order to receive tenure:

> She is making progress toward publishing her monograph based on her dissertation. She should, however, develop and submit articles for publication in the top refereed journals in her field based on her second book-length project on the Prussian Military Enlightenment and Friedrich II. Professor [Figal] should not risk spreading herself too thinly across multiple projects in this last crucial stage of her probationary period, but rather should focus on publishing articles in top-tier journals to demonstrate the viability of her second book-length project. Please be certain Professor [Figal] receives this advice and guidance not only from you but from her other senior colleagues as well. This is a critical time for her and the advice she receives should be clear and direct.

---

[1] In accordance with the faculty manual, Dr. Figal requested and was granted an extension of her "tenure clock" in 2003, thereby pushing back the date of her second reappointment to the spring of 2007. Her mandatory tenure review was extended to the 2008-2009 academic year.

Dean McCarty expressed some "concern" that Dr. Figal's first book had not been accepted for publication; he stated that the "[p]ublication of this work [Dr. Figal's first book] will cement her stature as a highly productive and visible scholar in the field of German cultural studies." Dr. Sevin subsequently sent Dean McCarty a memorandum confirming that he had communicated this counseling to Dr. Figal and stating that Dr. Figal had informed Dr. Sevin that she had made "considerable progress" on her second book length project and that she planned "to submit a couple of articles to major journals in the field" as soon as her first book had been submitted.

Dr. Figal's tenure review began during the summer and fall of 2008. There were two deadlines for Dr. Figal to get materials to Dr. Sevin, the department chair—one in the spring for sending materials to outside reviewers and a later one for materials to distribute within the department and the university. At the spring deadline, Dr. Figal's first book had been accepted for publication and was already in print. Dr. Figal elected not to provide the external reviewers with two articles in progress, one directly related to her second book project, because they were "not finished enough to go out."[2] There is some dispute as to why Dr. Figal elected not to send these materials to the outside reviewers; Dr. Figal asserts that she acted on the advice of faculty members in her department. By the time materials were submitted for distribution to department members, Dr. Figal had submitted two articles to top peer-reviewed journals. In October 2008, Dr. Meike Werner and Dr. Barbara Hahn, members of the department, were tasked with reviewing Dr. Figal's scholarly work and providing a written report to the tenured faculty members; Drs. Werner and Hahn received copies of the two articles that had not been sent to the external reviewers which Dr. Figal had now finished. By the end of November, Dr. Figal informed them that one article had been accepted for publication with revisions, and this fact was noted in their report.

The five tenured faculty members in the department unanimously voted to recommend Dr. Figal's promotion to associate professor with tenure and sent their recommendation to Dean Carolyn Dever. Dean Dever, however, concluded that Dr. Figal failed to meet the criteria of excellence in scholarship. In a memorandum dated February 13, 2009, Dean Dever conveyed her decision to Dr. Sevin. After analyzing Dr. Figal's record of scholarship and the letters from the external reviewers, Dean Dever did "not find evidence of careful methodological engagement in [Dr. Figal's] research record." She noted concerns regarding the quantity and quality of Dr. Figal's research. In summary, she stated: "[I]n the context of a record which is modest in quantity, quite problematic in the eyes of some external reviewers in quality, and more eclectic than sustained, I must conclude that Professor Eigen Figal has not met the research standard required for promotion to tenured associate

---

[2]Materials were sent out to the external reviewers by the end of the spring semester of 2008. These included Dr. Figal's first book and published articles.

professor."

The Senior Advisory Review Committee, a group consisting of members of the dean's office and selected tenured college faculty members, reached the same conclusion. The committee struggled to find evidence that Dr. Figal's second book project was well developed and noted that even external reviewers who endorsed tenure were "qualified in their evaluation of her scholarly record to date and of her future trajectory."

The department appealed the dean's non-concurrence to the Central Promotion and Tenure Review Committee ("PTRC"). Dr. Sevin wrote a letter of appeal, and Dean Dever wrote a memorandum in response. Dr. Richard Lehrer, chair of the PTRC, assigned two members to review Dr. Figal's file and provide reports to the committee—Dr. Mitchell Seligson (political science) and Dr. William Christie (school of management). On March 24, 2009, the PTRC voted unanimously to deny the appeal and to uphold the dean's decision not to promote Dr. Figal. On April 9, 2009, the dean informed Dr. Figal that her appointment would conclude at the end of the next academic year.

Dr. Figal then initiated a grievance against Dean Dever in accordance with the procedure outlined in the faculty manual. A faculty member may file a grievance asserting that the university has breached an obligation owed to the faculty member in regard to a decision on her reappointment, tenure, or promotion. The grounds for Dr. Figal's grievance were: (1) failure of the university to follow stated or reasonable procedures, (2) failure to adhere to the express or implied terms of her contract, and (3) violation of standards of professional ethics and academic freedom. An ad hoc committee chaired by Professor Suzanna Sherry (law school faculty) was appointed by the chair of the faculty senate.

The ad hoc committee met with Dr. Figal and with Dean Dever. By letter dated November 13, 2009, Professor Sherry provided Dr. Figal with a list of all persons who provided testimony or other information to the committee and a list of documents reviewed. Although she was given the opportunity to respond with comments, Dr. Figal did not respond to this letter. On November 23, 2009, the ad hoc committee provided Dr. Figal and Dean Dever with its preliminary findings of fact regarding the grievance. Dr. Figal submitted a response to these preliminary findings, and the committee met and revised its findings. The committee submitted its final report to the university's chancellor by letter dated December 18, 2009. In that report, the committee summarized and responded to Dr. Figal's five specific claims. The committee recommended that Dr. Figal's grievance be dismissed without further action, and the chancellor accepted this recommendation by letter dated December 28, 2009.

*Lawsuit*

Dr. Figal filed suit against Vanderbilt on March 17, 2010 asserting causes of action for breach of contract and negligent misrepresentation.

Vanderbilt moved for summary judgment on November 15, 2011. Along with its motion, Vanderbilt filed supporting documents, including portions of the depositions of Dr. Sevin and Dr. Hahn and the affidavits of Dr. Dever, Dr. McCarty, Dr. Hahn, Dr. Lehrer, and Professor Sherry. Dr. Figal opposed the motion for summary judgment, relying on documents including portions of her own deposition and the depositions of Dr. McCarty, Dean Dever, Dr. Christie, Dr. Sevin, and Dr. Robert Holub, her expert, as well as the affidavits of Dr. McCarty and Dr. Figal. In an order entered on April 3, 2012, the trial court granted Vanderbilt's motion for summary judgment and dismissed all of Dr. Figal's claims. The trial court concluded that, "[a]lthough [Dr. Figal] has shown some departure from the technical requirements of the Faculty Manual in the tenure process, [she] has failed to demonstrate a substantial departure that resulted in the failure of Vanderbilt to use professional judgment with respect to [her] tenure . . . ." The court denied a motion to alter or amend filed by Dr. Figal, and Dr. Figal appealed.

The notice of appeal initially filed by Dr. Figal was one day late, and this Court dismissed the appeal. The trial court, however, granted relief under Tenn. R. Civ. P. 60.02 and allowed Dr. Figal to file a new notice of appeal. Vanderbilt has appealed from that order.

*Issues on appeal*

Dr. Figal argues on appeal that the trial court erred in granting summary judgment to Vanderbilt by (1) applying a more relaxed and deferential standard of contract interpretation in favor of Vanderbilt because the contract involved an award of tenure and (2) resolving material issues of disputed fact in Vanderbilt's favor and failing to draw all inferences in favor of Dr. Figal. Dr. Figal also argues that the trial court erred in entering a protective order limiting discovery.

Vanderbilt argues that the trial court's grant of summary judgment was proper because there were no genuine issues of material fact, Dr. Figal failed to establish essential elements of her claims, and Vanderbilt negated essential elements of those claims. Vanderbilt further asserts that the trial court abused its discretion in granting relief to Dr. Figal under Tenn. R. Civ. P. 60.02 to allow her to file a new notice of appeal.

ANALYSIS

I.

We begin with the issue raised by Vanderbilt concerning the relief granted by the trial court under Tenn. R. Civ. P. 60.02.

Rule 60.02 of the Tennessee Rules of Civil Procedure allows a court to grant relief from a final judgment for "mistake, inadvertence, surprise or excusable neglect." Tenn. R. Civ. P. 60.02. We review a trial court's decision on a Rule 60 motion for relief under an abuse of discretion standard. *J & B Invs., LLC v. Surti*, 258 S.W.3d 127, 132 (Tenn. Ct. App. 2007). "'A trial court abuses its discretion only when it applies an incorrect legal standard, or reaches a decision which is against logic or reasoning that causes an injustice to the party complaining.'" *Caldwell v. Hill*, 250 S.W.3d 865, 869 (Tenn. Ct. App. 2007) (quoting *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). Under this standard, we are required to uphold the ruling "as long as reasonable minds could disagree about its correctness." *Id.* The abuse of discretion standard does not permit an appellate court to merely substitute its judgment for that of the trial court. *Id.* Thus, under the abuse of discretion standard, we give great deference to the trial court's decision. *Henry v. Goins*, 104 S.W.3d 475, 479 (Tenn. 2003).

The trial court entered its order denying Dr. Figal's motion to alter or amend on May 29, 2012. Dr. Figal filed her notice of appeal on June 29, 2012, one day after the 30-day deadline for appeal. As a result, on October 5, 2012, this Court dismissed Dr. Figal's appeal for failure to file a timely notice of appeal. Dr. Figal then filed a motion to remand to the trial court for the purpose of seeking relief under Tenn. R. Civ. P. 60, and this Court granted the motion.

On October 9, 2012, Dr. Figal filed a motion in the trial court for relief pursuant to Tenn. R. Civ. P. 60.02 from the order denying her motion to alter or amend. In support of this motion, Dr. Figal filed the affidavit of her attorney, Richard Braun, explaining the circumstances leading to the late filing of the notice of appeal. In this affidavit, Mr. Braun detailed his efforts to retire and bring his practice to a close, a recent marriage, relocation to Massachusetts, the sale of his wife's property, as well as health issues, including heart bypass surgery in December 2011. In light of these circumstances, Mr. Braun asserted, he was distracted and failed to meet the deadline for filing Dr. Figal's notice of appeal.

After Vanderbilt filed a response in opposition to the Rule 60 motion, Dr. Figal filed a reply accompanied by the affidavit of Jule F. Travis, an attorney employed by Mr. Braun as a research attorney, and another affidavit of Mr. Braun. In his affidavit, Mr. Braun

described the medications he had taken since his open heart surgery and associated problems with dizziness and drowsiness that continued to the present. Mr. Braun asserted his belief that the side effects of one of his medications was a contributing factor to his missing the filing deadline by one day.

In an order entered on November 14, 2012, the trial court made the following findings:

> Based on the affidavits submitted by Plaintiff's counsel, the Court finds that Mr. Braun's failure to file a timely Notice of Appeal of the Court's May 29, 2012 Order was a result of excusable neglect. The affidavits filed by Plaintiff's counsel set forth circumstances surrounding his failure to meet the deadline for filing the Notice of Appeal which include Plaintiff's counsel's medical condition, including drowsiness caused by medication which he has been taking, and the fact that Mr. Braun was essentially a sole practitioner as he is assisted only by one associate in his office who has appeared on the pleadings in this case but only appeared in court on behalf of the Plaintiff in opposition to the Defendant's Motion to Exclude the Plaintiff's Proposed Expert Witness.

The court granted the motion for Rule 60 relief, vacated the May 29, 2012 order, and refiled the order as of November 30, 2012. Dr. Figal subsequently filed a timely notice of appeal from the new order.

Vanderbilt argues that none of the reasons asserted by Dr. Figal's attorney for his failure to file a timely notice of appeal satisfy the standard for excusable neglect required under Tenn. R. Civ. P. 60.02. The causes for a party's failure to meet a deadline can range from "forces beyond its control to forces within its control." *State ex rel. Sizemore v. United Physicians Ins. Risk Retention Grp.*, 56 S.W.3d 557, 567 (Tenn. Ct. App. 2001). It has been stated that "[t]he former [forces beyond one's control] will almost always substantiate a claim of excusable neglect; the latter [forces within one's control] will not." *Id.* Excusable neglect may include "situations in which failure to comply with a filing deadline is attributable to a filer's negligence." *Id.* However, "[a]n attorney's mere oversight or negligence, without more, does not automatically amount to excusable neglect." *Ferguson v. Brown*, 291 S.W.3d 381, 388 (Tenn. Ct. App. 2008). Similarly, neither a lawyer's busy schedule nor his or her ignorance of the proper procedure rises to the level of excusable neglect. *Food Lion, Inc. v. Washington Cnty. Beer Bd.*, 700 S.W.2d 893, 896 (Tenn. 1985); *Jefferson v. Pneumo Servs. Corp.*, 699 S.W.2d 181, 185-86 (Tenn. Ct. App. 1985).

Determining whether neglect is excusable "is an equitable determination 'taking

-8-

account of all relevant circumstances surrounding the party's omission.'" *Sizemore*, 56 S.W.3d at 567 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). These circumstances, which "envelop the big picture of both causes and effects," include the following:

> (1) the danger of prejudice to the party opposing the late filing, (2) the length of the delay and its potential impact on proceedings, (3) the reason why the filing was late and whether that reason or reasons were within the filer's reasonable control, and (4) the filer's good or bad faith.

*Id.*

Vanderbilt focuses its argument on the third circumstance—the reason for the late filing— but fails to address the other three factors. Moreover, Vanderbilt did not submit any opposing affidavits. Vanderbilt argues that some of the circumstances discussed in Mr. Braun's affidavits, such as other legal matters requiring Mr. Braun's attention or a broken refrigerator, do not constitute excusable neglect. While we do not disagree with Vanderbilt's assertions regarding some of the reasons cited by Mr. Braun, the trial court focused its attention on Mr. Braun's medical condition (including the side effects of medications) and the fact that he was essentially a sole practitioner. *See generally LeDoux v. Pierce*, No. M2003-00671-COA-R3-CV, 2004 WL 1877357, at \*4 (Tenn. Ct. App. Aug. 20, 2004) (excusable neglect found in case of attorney closing practice); *Ferguson*, 291 S.W.3d at 388-390 (discussion of circumstances in case involving illness of attorney's brother). In light of all of the relevant circumstances, as well as Vanderbilt's failure to establish any prejudice, any potential impact of the delay, or any bad faith on Mr. Braun's part, we cannot say that the trial court abused its discretion in granting the motion for relief on the basis of excusable neglect.

## II.

Dr. Figal's first argument is that the trial court applied a "more relaxed and deferential standard of employment contract interpretation in favor of Vanderbilt simply because it involved the award of tenure." For the reasons discussed below, we find no error in the trial court's interpretation of the contract at issue in this case.

As with any other breach of contract action, Dr. Figal was required to show the existence of an enforceable contract, a breach of that contract, and damages as a result of that breach. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). There is no dispute that Dr. Figal and Vanderbilt had an enforceable contract; the issue is whether Vanderbilt breached that contract. As outlined above, the terms of Vanderbilt's

contract with Dr. Figal are contained in the faculty manual, the college rules, and the memoranda generated at the time of her reappointments.

In construing Vanderbilt's contract with Dr. Figal, the trial court adopted the following reasoning:

- The law provides that courts are to defer to the academic decisions of colleges and universities and not intrude on faculty employment determinations or substitute their judgment with respect to qualifications of faculty members for promotions or tenure.

- Only a substantial departure from accepted academic norms or from procedural regularity, to demonstrate that the university did not actually exercise professional judgment, warrants court intervention.

- The terms of the parties' contract require the Plaintiff to demonstrate scholarly excellence to obtain tenure, and the Defendant to use professional judgment in evaluating this excellence. . . . [T]he Court can not substitute its judgment nor allow the jury to, for the Dean's assessment of the quality and amount of the Plaintiff's scholarship.

The trial court did not defer to Vanderbilt's interpretation of the terms of the contract, but did defer to Vanderbilt's assessment of the strength or weakness of Dr. Figal's scholarly work.

There is no Tennessee case law addressing the review of a summary judgment regarding a tenure decision based upon an assessment of the excellence of a candidate's academic scholarship. Citing *Sawyer v. Mercer*, 594 S.W.2d 696 (Tenn. 1980), Dr. Figal emphasizes that our Supreme Court "applied usual and customary contract principles and held that the relationship between university and a faculty member was to be determined and controlled by the contract of employment." Similarly, in the present case, the usual rules of contract construction apply. The issue in *Sawyer*, however, was the application of a contract by which the faculty member would automatically get tenure at the end of a four-year probationary period unless the college gave notice within a certain time frame that the candidate was not to continue as a teacher at the college. *Sawyer*, 594 S.W.2d at 699. Because the college had not given the notice, the teacher was entitled to tenure. *Id.* In the case before us, the candidate's entitlement to tenure hinges upon the issue of excellence in academic scholarship. The Court's decision in *Sawyer* does not provide any guidance as to

our review of such a tenure determination.[3]

Dr. Figal also relies upon *Branham v. Thomas M. Cooley Law School*, 689 F.3d 558, 561 (6th Cir. 2012), a case involving the termination of a tenured law school professor. The issue in *Branham* was whether the decision to terminate the professor for refusing to teach a class had been voted on by the faculty as required under the employment contract. *Id.* The district court denied the law school's motion for summary judgment on a breach of contract claim and ordered the school to comply with the required dismissal procedure. *Id.* The school then held a faculty conference and concurred with the dean's decision to dismiss the professor. *Id.* The district court entered judgment against the professor, and the Sixth Circuit affirmed that decision. *Id.* at 566.

Like *Sawyer*, the *Branham* case hinged upon the school's compliance with a specific procedural requirement. While Dr. Figal asserts that there were procedural irregularities in her case (which will be addressed below), the issue being considered here is whether the trial court imposed a "heavy burden" on her and held that "private universities are exempt from usual and customary contract principles." We disagree. The trial court applied the usual rules of contract interpretation. The "deference" to which Dr. Figal objects has to do with the university's assessment of the excellence of her scholarly work.

What then is a court's role with regard to a university's tenure decision when the controlling issue is whether the candidate meets the university's standards for excellence in scholarship? Vanderbilt cites a host of federal cases, most of which involve discrimination claims, in which the courts have expressed reluctance to review tenure decisions requiring an assessment of academic scholarship or the resolution of academic disputes in advanced fields of study. *See Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 376-77 (4th Cir. 1995); *Fields v. Clark Univ.*, 966 F.2d 49, 54 (1st Cir. 1992), *cert. denied*, 506 U.S. 1052 (1993); *Brousard-Norcross v. Augustana Coll. Ass'n.*, 935 F.2d 974, 975-76 (8th Cir. 1991); *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92-93 (2d Cir. 1984); *Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 548 (3d Cir. 1980). Professorial appointments necessarily involve "subjective and scholarly judgments." *Smith v. Univ. of N.C.*, 632 F.2d 316, 345 (4th Cir. 1980). The Third Circuit has described the necessary level of caution to be exercised by courts as follows:

> [C]ourts must be vigilant not to intrude into [the tenure] determination, and should not substitute their judgment for that of the college with respect to the

---

[3]Our Supreme Court's decision in *Gossett v. Tractor Supply Co., Inc.*, 320 S.W.3d 777 (Tenn. 2010), determined that the burden-shifting framework used in retaliatory discharge cases was not appropriate to apply at the summary judgment stage. The case does not address summary judgment determinations regarding breach of contract actions with respect to tenure.

qualifications of faculty members for promotion and tenure. Determinations about such matters as teaching ability, research scholarship, and professional stature are subjective, and unless they can be shown to have been used as the mechanism to obscure discrimination, they must be left for evaluation by the professionals, particularly since they often involve inquiry into aspects of arcane scholarship beyond the competence of individual judges.

*Kunda*, 621 F.2d at 548. *See also Tanik v. S. Methodist Univ.*, 116 F.3d 775, 776 (5th Cir. 1997); *Bina v. Providence Coll.*, 39 F.3d 21, 26 (1st Cir. 1994), *cert. denied*, 514 U.S. 1038 (1995); *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980); *Villaneuva v. Wellesley Coll.*, 930 F.2d 124, 129 (1st Cir. 1991); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1326 (6th Cir. 1988).

Tennessee cases decided within the Sixth Circuit have adopted similar principles. In *Dobbs-Weinstein v. Vanderbilt University*, 185 F.3d 542 (6th Cir. 1999), a Sixth Circuit decision affirming a decision of the district court for the middle district of Tennessee, the court stated:

We acknowledge that "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92-93 (2d Cir. 1984) (providing reasons why tenure decisions are often difficult to place in a traditional employment framework: the lifetime nature of the contract, the fact that the decisions are often non-competitive, the decentralized nature of the decision-making process, the multiplicity of factors in the decision, the fact that tenure decisions are often quite contentious, and the reluctancy of courts to review the merits of a tenure decision).

*Dobbs-Weinstein*, 185 F.3d at 545.

In *Langland v. Vanderbilt University*, 589 F. Supp. 995, 997 (M.D. Tenn. 1984), *aff'd*, 772 F.2d 907 (6th Cir. 1985), a professor denied tenure brought claims for gender discrimination and a pendent state law claim for breach of contract. Although the English department voted to recommend Langland for tenure, the dean refused to concur in the department's decision and cited concerns about the quantity and quality of the professor's scholarship. *Langland*, 589 F. Supp. at 1000-1001. In her breach of contract claim, Langland argued that the dean evaluated her file using a standard different from the standard set forth in her contract, the terms of which included the faculty manual and the college's rules. *Id.* at 1002. The court determined that the college rules supplemented but did not replace the faculty manual, which required that a professor attain "national stature in her professional discipline" to justify awarding tenure. *Id.* at 1002-03. The court found no merit

in Langland's breach of contract claim. *Id.* at 1003. As to Langland's Title VII discrimination claim, the court found that she had established a prima facie case. *Id.* The university rebutted her prima facie case through the dean's testimony, in which he opined that "neither the quantity published nor the quality of Professor Langland's scholarly work justified an award of tenure." *Id.* The court noted: "It is beyond peradventure that deficient scholarship is a legitimate nondiscriminatory reason for denying a faculty member tenure." *Id.*

In its statements (quoted above) concerning its deference to a university's assessments of scholarly achievement, the trial court appears to have relied in part on the following language from a recent Ohio decision:

> As a general rule, courts defer to the academic decisions of colleges and universities unless there has been "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." [*Bleicher v. Univ. of Cincinnati Coll. of Med.*, 604 N.E.2d 783, 788 (Ohio Ct. App. 1992).]
>
> Further, in [*Gogate v. Ohio State University*, 537 N.E.2d 690, 695 (Ohio Ct. App. 1987)], this court cautioned trial courts to be diligent not to intrude into faculty employment determinations and not to substitute their judgment with respect to qualifications of faculty members for promotions or tenure. We further noted that determinations on such matters as teaching ability, research, and service simply cannot be evaluated solely on the basis of objective factors.

*Saha v. Ohio State Univ.*, No. 10AP-1139, 2011 WL 3359704, at *5 (Ohio Ct. App. Aug. 4, 2011).

We find no error in the principles used by the trial court in construing the contract (according to the usual rules of contract interpretation) and in declining to substitute its judgment for the university's assessment of Dr. Figal's academic scholarship.

III.

We next consider Dr. Figal's arguments regarding the trial court's grant of summary judgment to Vanderbilt.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Tenn. R. Civ. P. 56.04.

-13-

Summary judgments do not enjoy a presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003). We consider the evidence in the light most favorable to the non-moving party and resolve all inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). When reviewing the evidence, we must determine whether factual disputes exist. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If a factual dispute exists, we must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Id.*; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). To shift the burden of production to the nonmoving party who bears the burden of proof at trial, the moving party must negate an element of the opposing party's claim or "show that the nonmoving party cannot prove an essential element of the claim at trial." *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 8-9 (Tenn. 2008).[4]

Dr. Figal asserts that the trial court erred in granting summary judgment "by resolving material issues of disputed fact in Vanderbilt's favor and failing to draw all reasonable inferences in favor of Figal." Dr. Figal then elaborates by listing eight areas in which she asserts that there remain issues of material fact to be resolved. Like the trial court, we will address Dr. Figal's arguments under five categories.

## 1. Dean Dever's conduct

With respect to Dean Dever's conduct, Dr. Figal argues that the trial court erred in finding that Dean Dever made a careful and good faith analysis of her tenure file and materials in deciding that she did not meet the standards for tenure, in finding that Dean Dever did not substantially depart from academic norms (despite what Dr. Figal considers misrepresentations), and by accepting Dean Dever's negative interpretations of the external reviewers' letters despite contrary evidence from Dr. Figal's expert.

We begin by setting out what is undisputed concerning the criteria used to assess Dr. Figal's scholarly achievement. The following statements of fact were admitted by Dr. Figal:

- The burden of proof [regarding tenure] lies squarely with the candidate, whose credentials must demonstrate the very high standard of excellence required by a research university like Vanderbilt.
- In order to establish the required "excellence" in research or

---

[4] Tennessee Code Annotated section 20-16-101 (2011), a provision that is intended to replace the summary judgment standard adopted in *Hannan*, is inapplicable to this case. *See Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 25 n.2 (Tenn. 2011) (noting that section 20-16-101 is only applicable to actions filed on or after July 1, 2011). Dr. Figal filed this action on March 17, 2010.

scholarship, the requirements vary somewhat between those departments in the Humanities and those in the Natural Sciences or Social Sciences.

• Dr. Figal was in a department subject to the publication requirements of research scholars.

• By the latter part of November [2008] when [Dr. Werner and Dr. Hahn] provided their report, Dr. Figal advised them that she had been informed by the press that the article would be accepted for publication subject to revisions suggested by the press' outside reviewer.

• They [Dr. Werner and Dr. Hahn] took the status of the article into account when they wrote their report.

• As had been made clear to Dr. Figal in Dr. McCarty's counseling memorandum at the time of her second renewal in 2007, demonstration of progress toward a second book length project was required for her promotion.

• Based on her analysis of the letters from the external reviewers, Dean Dever had concerns regarding the quantity of scholarly work Professor Figal had had published since her arrival at Vanderbilt.

• In reviewing and analyzing the letters from external reviewers, the Dean must carefully weigh those letters and make a determination as to whether the negative comments are substantive and whether, on balance, the negative comments outweigh the positive ones.

• In those cases where the candidate's quality is not as clear, there will generally be negative or critical comments and the positive comments are more reserved.

• Professor Gail Hart from the University of California, Irvine, although recommending that Dr. Figal be promoted to Associate Professor with tenure, commented that Dr. Figal's [first] book is "problematic" and would have made a much better impression as a series of essays.

• Dr. Hart also found "disconnects" which she considered to be flaws in the format of the book, and described the final section as "overwrought."

• Dr. Jonathan Heiss from the University of North Carolina was highly critical of the book noting that Figal's peer review journal articles were her "great strengths," but that she seems "not to have mastered the genre of the scholarly monograph in quite the same way."

• Dr. Daniel Wilson from Royal Holloway, University of London, pointed out several weaknesses in the book including "too many cases in which Professor Eigen Figal overlooks previous research and makes some clear misstatements as a result, some of which are crucial to her

argument."

- Dr. Wilson also noted arguments based on mistakes or lack of clarity in the translation which Dr. Figal used and summarizes that "these marks of scholarly immaturity should surely have been rooted out of a manuscript published seven years after the dissertation from which the book originated."
- Dean Dever had concerns regarding the overall quality of Dr. Figal's published work.

With regard to the issue of Dr. Figal's progress toward a second book, the trial court concluded that there was "no genuine issue of material fact that the Plaintiff was told in 2007 by the Dean to have 'articles or papers' related to the Plaintiff's second book submitted for publication at the time of her tenure review. This was not done, the record establishes without question." In response, Dr. Figal emphasizes that, when her department voted in favor of giving her tenure in December 2008, she had submitted two articles, and one had received provisional acceptance for publication. Dr. Figal stated, however, that one of these articles ("The Caucasian Slave") was "tangential to my larger engagements" and was not intended to go directly into her second book.

The "misrepresentation" cited by Dr. Figal is Dean Dever's erroneous statement in her response to the PTRC that no part of Dr. Figal's work toward her second book had been reviewed by senior members of the department. The memorandum of Drs. Hahn and Werner, however, makes clear that they did indeed review the two current articles submitted by Dr. Figal; and they discussed the article "When Brothers are Enemies: Frederick the Great's Catechism for War" and its relationship to Dr. Figal's current book project. Thus, their report to the faculty did include materials related to the second book. In Dean Dever's earlier memorandum setting forth her decision, she specifically referenced the article submitted for publication. We find no evidence to support Dr. Figal's suggestion that Dean Dever substantially departed from academic norms or failed to act in good faith.

As to Dean Dever's conclusions drawn from the comments of the external reviewers, we find no merit in Dr. Figal's assertion that there are material facts in dispute. Even if we accept Dr. Figal's position that her expert witness, Dr. Robert Holub, opined that Dr. Figal's scholarship met Vanderbilt's standards of excellence, such an opinion does not create a disputed issue of material fact in this case. Absent evidence of discrimination or a substantial departure from academic norms, a university's assessment of a candidate's scholarly excellence is a matter within the professional judgment of the university. *See Dobbs-Weinstein*, 185 F.3d at 545; *Langland*, 589 F. Supp. at 1003. We agree with the findings and conclusions stated by the trial court:

The Court concludes that the summary judgment record establishes that Dean Dever made a careful and good faith analysis of the plaintiff's files and materials in deciding that the plaintiff had failed to satisfy the standard of excellence in research or scholarship. First, there is Dean Dever's independent judgment that the plaintiff had not made sufficient progress toward her second book-length project to demonstrate the "upward trajectory of research" for tenure. Combined with that are the mixed response from the outside reviewers, and that there were relatively few unqualified positive comments regarding the plaintiff's scholarly work. There is no genuine issue of material fact that the letters received from outside reviewers of the plaintiff's work contained positive and negative comments, and some noted the small quantity of work in the plaintiff's file. Under the deferential standard of applicable law discussed above, this Court is not permitted to substitute its judgment unless there is a substantial departure from academic norms. The mixed response from the reviewers provides a rational basis for Dean Dever's decision such that there has been no substantial departure from academic norms.

## 2. PTRC Procedure

Dr. Figal next asserts that the trial court erred in finding that errors and failure to adhere to PTRC protocol had no impact on the PTRC's decision to uphold Dean Dever's denial of tenure.

We will consider each error in turn. Dr. Figal asserts that the PTRC took no action to resolve the conflict between two inconsistent statements by Dean Dever (discussed above) regarding the department's review of articles related to Dr. Figal's second book project. We agree with the trial court's conclusion that this mistake "had no impact upon the PTRC decision because the mistake was minimized and/or cured." As stated above, Dean Dever's memorandum of February 13, 2005 specifically referenced the article submitted to the journal *18th Century Studies*. The article was discussed in the memorandum of Drs. Hahn and Werner, in the minutes of the faculty meeting at which the tenure vote was taken, and in Dr. Sevin's memorandum recommending promotion. Moreover, Dr. Seligson and Dr. Christie, members of the PTRC, referenced the article in their reports.

Dr. Figal asserts that the PTRC erred in not appointing an ad hoc committee to evaluate Dr. Figal's case. The faculty manual provides that, in an appeal of a negative decision by a dean regarding tenure, the PTRC "may" appoint an ad hoc committee composed of faculty members from disciplines related to that of the candidate. In this case, the PTRC chair, Dr. Lehrer, concluded that there was no need to appoint an ad hoc committee. The committee was provided with Dean Dever's statements regarding her

reasoning as well as a letter from Dean Sevin outlining the department's support for Dr. Figal's tenure application. The faculty manual gives the PTRC the discretion to determine whether an ad hoc committee is necessary.

Dr. Figal also emphasizes that Dr. Seligson conducted a Google search to learn more about the periodicals in which Dr. Figal's articles were published and that he speculated that Dr. Figal's first book had been rejected by SUNY press before being submitted to another press. In an affidavit, Dr. Lehrer testified that Dr. Seligson's Google search "did not influence the PTRC's vote" and that his supposition about the publication of Dr. Figal's book by Rutledge Press, which he recognized as a "solid" publisher, "was not regarded as a negative factor by the Committee." Moreover, we agree with the trial court's reasoning that these errors were not material in the PTRC's decision:

> The PTRC determined there was no sufficient evidence of meritorious scholarship by Dr. Figal to justify promotion to Associate Professor with tenure. Because of the relatively small number of scholarly works produced by Dr. Figal at the time of her consideration for promotion, the Committee felt that there needed to be clear indications of excellent quality in the work which did exist. The PTRC also found that the letters from the external reviewers were "very mixed" with several reviewers expressing clear reservations about Dr. Figal's book-link project. The PTRC found that the Dean's denial of promotion and tenure was carefully reasoned and well-supported in light of its examination of the record.

### 3. Grievance Procedure

Dr. Figal argues that the trial court erred in finding that Vanderbilt's violation of the grievance procedures and failure to adhere to other policies had no material adverse impact on the tenure review process in her case.

The faculty manual gives a faculty member the right to file a grievance asserting that the university breached an obligation to the faculty member with regard to a decision on his promotion or tenure. After a grievance has been filed, the grievance committee informs the person against whom the grievance is filed and that person has the opportunity to submit a response. A copy of the response is to be provided to the grievant unless it contains confidential information, in which case the grievance committee is to provide the grievant with a summary of the response.

The error relied upon in this case by Dr. Figal is that the grievance committee determined that it did not need to request a response from Dean Dever because the committee

already had the Dean's memorandum dated February 13, 2009 in which she gave a detailed explanation of the basis for her decision as well as the Dean's response to the department's appeal to the PTRC. Dr. Figal's argument is that, because the grievance committee did not obtain a response from Dean Dever, Dr. Figal was deprived of the opportunity to review materials provided by Dean Dever in a response. She asserts that, had responsive materials been provided to her, Dr. Figal "would have pointed out the Dean's misrepresentation to the PTRC that no part of her work toward the second book project was reviewed by senior faculty." According to Dr. Figal, had she known of that inconsistency before the filing of the present lawsuit, "the error could have been corrected and the PTRC requested to review the file once again with the correct information in front of it."

As discussed above, we agree with the trial court's reasoning that the misstatement in one of Dr. Dever's memoranda concerning the articles available to the faculty at the time of their tenure vote was not material to the reasons given by the PTRC for affirming Dean Dever's decision. Moreover, we agree with the trial court that this deviation was harmless in light of the procedures followed by the grievance committee, including meeting twice with Dr. Figal, providing her with a list of all individuals giving information to the committee and of all documents reviewed by the committee, and providing her with preliminary findings of fact to which Dr. Figal responded and which were then revised by the committee. Professor Sherry, chair of the grievance committee, summarized the committee's conclusions regarding Dr. Figal's claims:

> 1. Professor Figal's claim that Dean Dever's negative assessment of Professor Figal's research was inconsistent with Dean Richard McCarty's positive review of Professor Figal's research at her fifth-year review, and that Professor Figal "did all that was recommended [by Dean McCarty] and more":
>
> This claim has no basis in fact, as indicated by the Committee's Finding of Fact #1. Professor Figal failed to submit to a peer-reviewed journal more than one article related to her second project, as required by Dean McCarty's memorandum.
>
> 2. Professor Figal's claim that Dean Dever's negative assessment of the quality of the journals in which Professor Figal had published was inconsistent with the counseling that Professor Figal had previously received because "no doubts were voiced at [her] fifth-year review (or at any point since) regarding [her] choice of publishing venues":
>
> This claim has no basis in fact, as indicated in the Committee's Finding of Fact #2. Dean Dever did not question the quality of the journals.

-19-

3. Professor Figal's claim that Dean Dever placed "undue and unreasonable restrictions upon the pool of possible outside reviewers":

This claim has no basis in fact, as indicated in the Committee's Finding of Fact #3. Dean Dever approved all of the reviewers who were suggested by Professor Figal and submitted to Dean Dever for her approval.

4. Professor Figal's claim that Dean Dever delayed approving outside reviewers, which led to reviewers being asked to write "so late in the season that they were no longer available to write an evaluation":

This claim has no basis in fact, as indicated in the Committee's Findings of Fact #4 and #5. Dean Dever did not unreasonably delay her approval, and the pool of reviewers was not significantly diminished.

5. Professor Figal's claim that Dean Dever rejected the views of the tenured faculty of the Department and "substituted an arbitrary, erroneous, and unfair interpretation" of the external review letters:

This claim has no basis in fact, as indicated in the Committee's Finding of Fact #6. Dean Dever's interpretation of the external review letters is supported by extensive quotations from those letters, arguments detailing the reasons for the interpretation, and the discussions of the A&S Senior Advisory Review Committee.

The grievance committee's failure to obtain a written response from Dean Dever did not affect the grounds upon which the committee based its decision.

### 4. Other Tenure Candidates

We find no merit in Dr. Figal's assertion, without significant supporting argument, that the trial court erred in "refusing to consider the unfairness of Vanderbilt's promotion of other Vanderbilt lesser qualified tenure candidates."

The two faculty members identified by Dr. Figal are Dr. Emanuelle Oliviera from the Department of Spanish and Portuguese and Dr. Paul Young from the Department of English. Dr. Figal argues that her tenure file was "stronger" than the files of these two faculty members who were awarded tenure. The trial court pointed out circumstances distinguishing the cases of these professors from that of Dr. Figal. As Vanderbilt aptly asserts, however, "what satisfies the requirement of excellence in research or scholarship is by nature

-20-

subjective and may vary among different academic departments and disciplines." The tenure standards for one department may differ somewhat from the standards of another department "so long as those standards are neither higher than the contractual terms of employment nor discriminatory in origin or application." *Langland*, 589 F. Supp. at 1011. Assessing excellence in scholarship is precisely the type of determination the courts leave up to the university's professional judgment.

### 5. Failure to Mentor

Dr. Figal's final argument here is that the trial court erred in failing to "place any importance on the fact that Figal was not properly mentored."

We disagree with the premise of Dr. Figal's argument because we find no evidence that Dr. Figal was not properly mentored. The following statements of fact, which were admitted by Dr. Figal, are relevant here:

- Although he concluded that Dr. Figal was "on track" towards promotion to Associate Professor with tenure, and that her progress as of June, 2007 warranted her reappointment, Dean McCarty also emphasized the continued progress that Dr. Figal needed to make in order to be promoted to Associate Professor and to receive tenure.
- In that [June 22, 2007] memorandum, Dr. Sevin stated that Dr. Eigen (Figal) had informed him that she had made "considerable progress" with her second book length project and that " . . . she plans to submit a couple of articles to major journals in the field as soon as the above monograph [her first book] has been submitted."
- In his counseling memorandum dated June 15, 2007, Dean McCarty did not comment on the quality of Dr. Figal's first book-length project which, as of the date of that memorandum, had still not been accepted for publication.
- Since it had been over six years since Dr. Figal received her PhD degree based, in part, on the dissertation from which that book was derived, Dean McCarty expressed his "concern" that the book still had not been completed or accepted for publication for almost six years.
- Dr. Figal concedes that she did not view Dean McCarty's renewals of her appointment as a guarantee of tenure.
- In the Spring [of 2008], Dr. Figal did not submit any articles that were "not finished enough to go out . . ."
- Dr. Sevin ultimately left it up to Dr. Figal as to what she put in the file to be sent to outside reviewers, but counseled her that she should not

submit "drafts" of articles that were not completed since that could be "detrimental."

Dr. Figal's characterization of the undisputed facts is that she "was counseled by the senior members of her Department not to submit work toward her second book project to external reviewers." There is no dispute that a candidate's failure to submit work toward a second book to the external reviewers makes it harder to obtain tenure. The issue here, however, is that, at the time when materials were sent out to the external reviewers in the spring of 2008, Dr. Figal's article related to her second book was, by her own admission, "not yet in a form that met my own high standards for submission." Thus, Dr. Figal's failure to send out these materials was a result of her failure to have them ready, not of any bad advice from her colleagues. (The fact that such materials can, in certain circumstances, be sent later does not change the fact that Dr. Figal was late in having her article(s) ready to go out. Moreover, there is no evidence that she requested such an accommodation.)

Dr. Figal also argues that the university gave her too many service assignments, which interfered with her progress toward tenure. The undisputed facts do not, however, support this theory. As Dr. Figal has conceded, the burden of proof was on her to demonstrate the credentials necessary to be awarded tenure. There are multiple instances in the record in which she was cautioned not to allow service obligations to sidetrack her work toward obtaining tenure:

- In 2004, Dr. John McCarthy, a senior member of her department, counseled Dr. Figal about "the dangers of becoming distracted" and "devoting too much time" to service assignments before receiving tenure.
- In his September 2005 counseling memorandum, Dean McCarty cautioned that Dr. Figal should "heed the advice of her senior colleagues to limit such commitments [referencing Dr. Figal's involvement in leadership and service activities] in order to preserve time to dedicate to her research and teaching, especially to the completion of her book."
- In his October 2005 memorandum, Dr. Kustanovich confirmed to Dr. McCarty that he had "reiterated to her the advice to limit such [service] commitments and to focus on her research and teaching."

It was up to Dr. Figal to limit her activities in order to allow herself time to work toward tenure.

We find no disputes of material fact and conclude that the trial court did not err in

-22-

granting summary judgment.

## IV.

The final issue for our determination is whether the trial court erred in limiting discovery.

During the litigation, Dr. Figal obtained followup letters from some of the external reviewers used in the tenure decision. Vanderbilt filed a motion for a protective order to exclude those letters or any testimony by the outside reviewers seeking to "amplify, explain or modify the statements set forth in their original letters." In an order entered on December 14, 2011, the trial court granted Vanderbilt's motion for protective order. The trial court reasoned that these letters were irrelevant: "The issue for the jury is Vanderbilt's conduct during the tenure application and decision process based upon information available at the time. The follow-up letters were not part of that information. Accordingly, they are not relevant." On appeal, Dr. Figal argues that these letters were relevant to determining whether Vanderbilt breached its covenant of good faith and fair dealing.

The trial court's decision on Vanderbilt's motion for a protective order was a decision to exclude the follow-up letters obtained by plaintiff's counsel from some external reviewers. The admissibility of evidence is within the trial court's sound discretion, and we review the trial court's decision to admit or exclude evidence by an abuse of discretion standard. *Mercer v. Vanderbilt Univ., Inc.*, 134 S.W.3d 121, 131 (Tenn. 2004); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992). Similarly, a trial court's decision to grant a protective order is reviewed under the abuse of discretion standard. *Conger v. Gowder*, No. E2000-01584-R3-CV, 2001 WL 301155, at *4 (Tenn. Ct. App. Mar. 29, 2001). Under the abuse of discretion standard, a reviewing court cannot substitute its judgment for the trial court's judgment. *Wright ex rel. Wright v. Wright*, 337 S.W.3d 166, 176 (Tenn. 2011). Rather, a reviewing court will find an abuse of discretion only if the trial court "applied incorrect legal standards, reached an illogical conclusion, based its decision on a clearly erroneous assessment of the evidence, or employ[ed] reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008); *see also Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

We find no abuse of discretion in the trial court's decision to exclude these letters or any related testimony from the litigation as such evidence was not relevant to the issues before the court.

CONCLUSION

We affirm the decision of the trial court. Costs of appeal are assessed against the appellant, and execution may issue if necessary.

_____
ANDY D. BENNETT, JUDGE